**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HEDGEYE RISK MANAGEMENT, LLC, | : |
| | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| NADINE TERMAN AND SOLSTEIN CAPITAL, LLC | : |
| | : |
| Defendants. | : |
| | : |
| | : |

No. 1:22-cv-01113-ALC-RWC

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff Hedgeye Risk Management, LLC ("Hedgeye") brings this suit against

Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein Capital")

(collectively, "Defendants") and alleges:

### SUMMARY OF THE ACTION

For more than five years, Terman, and her firm, Solstein Capital, subscribed to Hedgeye,

paying hundreds of thousands of dollars, to access Hedgeye's proprietary research and predictive

macro forecasting process. Terman and Solstein relied on Hedgeye to execute a top-down view

that proactively transitions portfolios ahead of major macroeconomic environmental changes and

employs quantitative trading signals as part of its investment framework. Hedgeye valued

Solstein and Terman as high-touch clients dedicated to implementing the Hedgeye investment

process for their clients. Terman valued Hedgeye's process and appeared to value Hedgeye's

intellectual property; however, she and her firm engaged in conduct unimaginable for a trusted-client – conspiring to steal Hedgeye's trade secrets, sabotage its business and orchestrate a partnership with a former Hedgeye Managing Director to take and destroy Hedgeye intellectual property and conceal his actions, and Terman's involvement.

In early 2021, Terman – a regular CNBC contributor – conspired with a former Hedgeye Managing Director to steal Hedgeye's confidential information and trade secrets to end Terman's and Solstein's dependency on Hedgeye, and to launch a company, "42 Macro," whose sole business consists of selling research derived from stolen Hedgeye financial models.

Every day, week and month, 42 Macro sells those results to investors, who would otherwise be Hedgeye customers, including Terman and Solstein Capital themselves—who continue to utilize Hedgeye's proprietary process through their relationship with 42 Macro. Hedgeye's losses are measured in millions of dollars to date.

In trade secret litigation pending in federal court in the Southern District of New York, Darius Dale, the former Hedgeye Managing Director with whom Terman conspired, already has admitted taking Hedgeye's key proprietary financial models, client lists with thousands of contacts, and other proprietary and confidential information.  Dale and 42 Macro currently operate under a preliminary injunction of that Court.  Through discovery, Hedgeye only recently has learned of the egregious conduct and brazen betrayal and deception of Terman and Solstein to exploit Hedgeye' successful business and trade secrets for their gain.

## PARTIES

1.      Hedgeye Risk Management, LLC, is a Delaware limited liability company with its principal place of business located at 1 High Ridge Park, Stamford, CT 06905.

2

2.      Nadine Terman is an individual who, upon information and belief, resides in Palo Alto, CA.

3.      Solstein Capital, LLC, is a Delaware limited liability company with its principal place of business at 1285 El Camino Real, Suite 100, Menlo Park, CA 94025.

4.      Terman is a founder, Chief Executive Officer ("CEO") and Chief Investment Officer ("CIO") of Solstein Capital.  All the actions she is alleged to have undertaken were taken by her in those capacities; that is, at all relevant times Terman was acting within the scope of her employment and as an agent for Solstein Capital.  However, she is also personally liable as an individual tortfeasor.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  On information and belief, this Court also has original diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inter alia, because a substantial part of the events giving rise to the claims occurred in this District.  Specifically, Hedgeye's misappropriated trade secrets and confidential information were acquired, disclosed and used in this District.  Defendants further disseminated the misappropriated trade secret and confidential information from, and to, this District.  Hedgeye's misappropriated trade secret and confidential information also remains in this District on one or more hard drives or other electronic devices.

7.      Personal jurisdiction over these Defendants is proper due to their targeted actions in the state of New York.  Darius Dale was living and working in New York during the entire relevant timeframe, and all communications between Terman, Solstein and their co-conspirators were sent into and from New York.  Specifically, as set out further below, Terman and Solstein solicited Dale in New York to breach his employment agreement (*see, e.g.,* ¶¶55-57), offered business advice to 42 Macro in New York (*see, e.g.,* ¶¶ 65, 72, 74-75), acquired Hedgeye's trade secrets from Dale in New York (*see, e.g.,* ¶¶77, 80-87), advised Dale in New York about wiping his computer in New York (*see, e.g.* ¶92), and conspired with Dale in New York to steal and use Hedgeye's confidential customer lists and notebooks in New York and elsewhere (*see, e.g.,* ¶¶105, 109-112). All of these communications and actions were directed to and took place in New York.

8.      Further, during the entire relevant timeframe, Terman and Solstein were active participants in the conspiracy being executed by Dale from New York with knowledge that acts in furtherance of the conspiracy had taken place in New York, where Dale lived and worked.  All of Terman's and Solstein's actions were carried out with a common interest and purpose with Dale in New York.

9.      Further, on information and belief, Terman and Solstein regularly conduct business in New York, including after they misappropriated Hedgeye's trade secrets as alleged herein.  42 Macro, which Terman and Solstein helped form and launch, has its operations based in New York. Further, its public face and key employee are all located in and work out of New York.   As alleged herein, Terman and Solstein disclosed Hedgeye's trade secrets to 42 Macro in New York and receives from 42 Macro in New York macro-economic research created with

Hedgeye's trade secrets.  Terman and Solstein then subsequently use that research to target and sell to customers and potential customers, including Hedgeye's customers, in New York.

## FACTS COMMON TO ALL CAUSES OF ACTION

**Hedgeye**

10.     Hedgeye was founded in 2008 by CEO Keith McCullough and President Michael Blum.  Hedgeye met its mission to create something that didn't then exist: hedge fund-quality research for everyday investors.  But Hedgeye also has evolved into the premier unbiased and uncompromised investment research house among the world's institutional investors.  Its institutional customer base advises over $10 trillion in assets.  The Hedgeye team features some of the world's most well-qualified and highly regarded research analysts, with extensive experience.  It continues to grow with over 70 full-time employees, 40 of which are research analysts and institutional sales professionals.

11.     Hedgeye commands both breadth and depth in its unique research offering.  The firm's flagship offering is macro-economic risk management with fundamental research coverage across nearly 20 sectors, including Restaurants; Consumer Staples; Retail; Gaming, Leisure & Lodging; Financials; Housing; Healthcare; Industrials; Materials; Technology; Communications; REITS; Demography; China; Cannabis; Legal Catalysts and Policy.

12.     Since 2013, Hedgeye has been broadcasting HedgeyeTV over the Internet from its primary studio in Stamford, CT.  Through its rapidly growing subscriber base and marketing channels (including social media), Hedgeye reaches an audience of over 500,000 investors predominantly in the United States and also in nearly 100 countries around the world.

**Hedgeye's Proprietary and Confidential Information and Trade Secrets**

13.     Hedgeye is a publisher of financial market and economic analysis.  Hedgeye develops and uses proprietary financial models that facilitate insights and recommendations after incorporating and weighing a vast number of carefully selected data points.  These models are critical to Hedgeye's business.

14.     Hedgeye's "Growth, Inflation & Policy" model, or GIP, is a core Hedgeye "source model" that was developed and iterated upon by Hedgeye's Founder & CEO McCullough over his many years of experience as a portfolio manager to major hedge funds on Wall Street.  Over time, McCullough and his team formalized and productized the GIP Model and it became one of the core Hedgeye flagship macro-economic research products and services.

15.     Hedgeye's "source models" are dynamic market and economic analysis engines built into Excel spreadsheets.  The spreadsheets use APIs (Application Programming Interfaces) to dynamically gather virtually real-time financial marketplace and economic data from a number of sources.  Hedgeye selects dozens of discrete data points from a near-infinite number of potential inputs from virtually every country in the world, to which Hedgeye assigns varying weights.  The proprietary source models then apply mathematical formulas that Hedgeye has developed to carefully weigh, combine, and analyze the data, and feed the results to "output models."  The selection, combination, and weighting of those data points are Hedgeye trade secrets.  Hedgeye sells to its subscribers investment recommendations and comprehensive financial market and economic research and analysis based on its models, and it shares the output models with certain institutional subscribers.

16.     Subscribers who receive the output models cannot access the source models on which they are based.  Subscribers cannot, for example, view the underlying methodology that

goes into the source models, update the output models, etc.  Subscribers do not have access to or visibility into how Hedgeye's algorithms work or derive information.

17.    Hedgeye's financial models include Hedgeye's proprietary combination of specific sources from which economic data is gathered, the weights given to the data, the combination of the weighted data, and the internal functioning of its dynamic market and economic analysis engines.

18.    Hedgeye's proprietary models allow Hedgeye to develop both a highly accurate real-time assessment of near-term economic and inflation momentum, as well as a high-probability scenario for where growth and inflation are likely to trend over the next twelve months.

**Hedgeye's Development Of Its Proprietary And Confidential Information**

19.    Hedgeye began developing its financial models early in the firm's history and the models have evolved over time.  The GIP, and related source models, are the "crown jewels" of Hedgeye's intellectual property, being the product of Hedgeye's investment of many millions of dollars, as well as years of intensive work, troubleshooting, continuously improving and innovating, as well as working closely with its customers.  Hedgeye's models were developed iteratively over time by teams of Hedgeye employees acting within the course and scope of their employment.

20.    Hedgeye's competitive advantage arises from the secrecy of its models because no other competitor employs the same proprietary methods.  For example, to model GDP (Gross Domestic Product), Hedgeye uses a traditional base model but then models GDP and inflation

"stochastically" applying probability theory, whereas most of its competition uses much more basic linear regressions and deterministic models.

21.     Hedgeye's core model employs 30 uniquely curated and back-tested economic data points to which Hedgeye assigns varying weights.  Back-testing is a gold standard by which models are applied retroactively, and their predictive results are measured with the benefit of hindsight.  No other competitor uses those same Hedgeye data points, or uses data points in the same way with the same weighting.  It took Hedgeye many years and significant investment of resources to derive the mix of indicators to where they are today.  Hedgeye's models also dynamically re-weigh the 30 data points for "marginal rate of change" impact; in essence, the model continually retrains itself based on the curated source data.

**Hedgeye's Confidential Client Information**

22.     Hedgeye has hundreds of institutional investor clients who pay significant amounts of money to subscribe to Hedgeye's research.  Hedgeye has thousands more retail investor subscribers to its one-to-many newsletter and webcast research.  Most or all of the institutional investors do not want third parties to know about their engagement with Hedgeye because they do not want customers to know what information they buy rather than create; Hedgeye's standard institutional service agreement offers such institutional subscribers a promise that Hedgeye will not disclose their identity.

23.     Hedgeye also has assembled various customer lists over a period of years, through the expenditure of substantial time and money including personal solicitation.  It would take years to develop the lists from scratch, if it were even possible.

24.     Hedgeye's customer lists are particularly valuable because they reflect Hedgeye's selection of customers constituting a specialized market; that is, key buy-side investment personnel, professional money managers, and registered investment advisors and sophisticated retail investors, who are interested in particular investment services such as dynamic investment models and daily podcasts, their interest level, and the amount they wish to pay for such research.

25.     For example, Hedgeye weekly sent a "Rise & Grind" e-mail to approximately 1,600 names (about 300-400 Hedgeye institutional subscribers in total).  That list was further curated to include only particular contacts who did a certain minimum amount of business with Hedgeye; in other words, the list was curated to contain contact information for what had proven to be Hedgeye's most engaged and lucrative subscribers, and had opted to receive higher level of engagement on Hedgeye's models.

26.     Hedgeye uses a third-party service called StreetContxt to manage some institutional client lists and to create more particularized lists to distribute specific content to only those clients.  Hedgeye also keeps a master list of contacts that Hedgeye developed only through the substantial investment of time, money and energy.  Assembling them took many hours of work over the course of many years at the cost of millions of dollars.  Given Hedgeye's business model of, in part, providing email content via paid subscriptions, the contacts are one of Hedgeye's most valuable assets.  The contacts are especially valuable because they reflect Hedgeye's current, paying clients with particularized interest in macroeconomic research data; *i.e.*, the most likely prospective paying customers for a competitor to target.

**Hedgeye Notebooks**

27.     Hedgeye's CEO Keith McCullough developed through years of experience a method of creating and maintaining "notebooks" to document whether certain securities are trending bullish or bearish based on Hedgeye's proprietary market signals.  McCullough's proprietary method of note-taking constitutes Hedgeye trade secrets.  The notebooks also constitute and contain Hedgeye confidential information and trade secrets, as they contain a daily, systematic recording of carefully curated macroeconomic data regarding investable securities, commodities, currencies and indices.  This collection of economic data is annotated with Hedgeye's trade secret trend signals, notes regarding specific Hedgeye clients' interest therein; and the means for communicating the results of Hedgeye's trade secret economic analysis methodology.

28.     The notebooks also contain notes from meetings with Hedgeye institutional customers.  The content of those notes, including the identity of customers, and when and what topics were discussed in those meetings, also constitute Hedgeye's trade secrets.

**Hedgeye's Measures to Protect Its Confidentiality Information**

29.     All Hedgeye employees are required to sign agreements acknowledging that the information to which they would be exposed at Hedgeye is proprietary and confidential.  Hedgeye employees are trained regarding the identification and treatment of confidential and proprietary company information, and employees are required to agree not to disclose such information to anyone outside Hedgeye at any time either during or after their employment.

30.     Hedgeye employees also are legally bound by Hedgeye's written Code of Ethics, which was distributed to all employees.  The Code of Ethics requires employees to acknowledge

that they owe a "duty of loyalty to the Firm," and reaffirm that they "must only use Firm confidential information for authorized purposes."

31.     Each employee also is required to submit an annual "Year End Attestation" certifying his or her compliance with Hedgeye's Code of Ethics.

32.     Hedgeye's confidential information and trade secrets are disclosed on a "need-to-know" basis.  All confidential information and trade secrets is required to be stored only on the company network, and that network is password protected and requires a secure VPN login to access remotely.  Further, access to specific directories, folders and files is permission-based.

33.     Hedgeye is not aware of any prior breach of confidentiality concerning its proprietary and confidential information.  Hedgeye has no reason to believe that its confidential information and trade secrets could be disclosed other than intentionally.

34.     Hedgeye's most active and important trade secret models were controlled by a former Managing Director at Hedgeye, and no other employee had access to Hedgeye's most current versions of those models.  Those models generally were not shared internally or externally.  Even the client-facing output models were provided only under a limited license and could not be republished pursuant to Hedgeye's service agreement (for institutional clients), disclaimers and website Terms of Service (for retail or mass market subscribers).

**Nadine Terman and Solstein Capital**

35.     Nadine Terman is a founder, CEO and CIO of Solstein Capital, a San Francisco-based investment firm.  Terman founded Solstein Capital in 2010, two years after Hedgeye was founded.

36.     Prior to founding Solstein Capital, Terman was a professional investor focused on bottom-up company analysis.  Solstein Capital first subscribed to Hedgeye Macro research from 2011 until late 2012.

37.     After a few years without a subscription to Hedgeye, Terman wrote to Hedgeye customer service in January 2016 inquiring about products and services.  For the first quarter of 2016, Terman negotiated with Hedgeye for an institutional-level subscription to Hedgeye, but ultimately advised Hedgeye that Solstein could not afford Hedgeye's services at that time. However, in November 2106, Terman, through her personal email account, signed up for an annual subscription to Hedgeye's All-Access Pass, a bundle of various mass market macro research products designed and marketed to serious retail investors – not institutional investors.

38.     In the first half of 2017, Terman begin negotiating again with Hedgeye for an institutional-level subscription to Hedgeye Macro research for Solstein Capital.  Solstein Capital came on as an institutional subscriber to Hedgeye's Macro research (as well as other sector-specific research) in July 2017.

39.     Over time, Terman (and, necessarily, Solstein Capital) deemed Hedgeye's macro research and process as indispensable to their business.  Terman communicated frequently via email, phone and in-person, with Hedgeye analysts (including McCullough, Dale and then-Hedgeye Macro analyst, Ben Ryan).  Terman's use of Hedgeye's research allowed her to market Solstein Capital as having a "top-down view that proactively transitions portfolios ahead of major macroeconomic environmental changes and employs quantitively trading signals as part of its investment framework."

40.     Solstein Capital remained a subscriber to Hedgeye's institutional macro-economic research until April 1, 2021.  At times its subscription included both Macro and fundamental stock research; paying Hedgeye up to $140,000 per year.

41.     From 2014-2019, Ben Ryan worked closely with McCullough on Hedgeye's Macro research team.  Ryan rose to the rank of top macro market volatility signal analyst under McCullough.  Ryan worked with Terman while Solstein Capital was a client of Hedgeye's.  In 2019, Terman and Solstein Capital hired Ryan as their Vice President of Investments, even though Hedgeye and Solstein had agreed to a mutual non-solicitation clause in their negotiated service agreement.

42.     On information and belief, Terman and Solstein Capital hired Mr. Ryan in an effort to obtain Hedgeye's trade secret process.  A short time after hiring Mr. Ryan, Terman and Solstein Capital decreased their annual subscription fees with Hedgeye by 50%.

43.     Separate and apart from Hedgeye's business of subscription-based financial research, Hedgeye also has an extensive and expanding media presence through its "HedgeyeTV" platform.  Mass market subscribers tune into Hedgeye's website multiple times a day to consume various macro, stock-specific, and general financial market commentary and information.  Hedgeye hosts two daily shows, The Macro Show and The Call (around-the-horn style market and stock commentary from every analyst).  On an average market day, Hedgeye may have anywhere from one to four additional live or recorded shows.

44.     CNBC primarily carries business day coverage of U.S. and international financial markets.  Hedgeye directly competes with companies like CNBC and Bloomberg for the attention of intelligent investors seeking accurate and predictive financial information.  For

13

example, Hedgeye directly competes with CNBC for viewers and followers of CNBC's Fast Money and Jim Cramer programming.

45.     Beginning in early 2020, Terman became a key CNBC contributor, where it was not uncommon for her to use Hedgeye's recognizable jargon and nomenclature, parrot Hedgeye's market predictions and reference Hedgeye's research without credit given to Hedgeye.  In this way, Terman helped CNBC, Hedgeye's competitor, to benefit from Hedgeye's research.  Terman often would pass off Hedgeye's advice and process as her own.

46.     Except as expressly set forth herein, all actions and inactions of Terman alleged herein are attributable to Solstein Capital.

**Darius Dale**

47.     Darius Dale is a disgruntled former Managing Director at Hedgeye who managed Hedgeye's relationship with Terman and Solstein Capital.

48.     Prior to his departure from Hedgeye discussed below, Dale worked closely with McCullough to run Hedgeye's Macro quad-based framework.

49.      Dale is a defendant in the federal court trade secret litigation described below.

**Steven Lamar**

50.     Steven Lamar subscribed to a number of premium Hedgeye mass market products as a retail investor, in contrast to Solstein Capital, for example, which was an institutional subscriber.

51.     On information and belief, upon learning that Hedgeye does not manage money, Lamar turned to Terman after seeing her in a Real Conversation (a long-form interview format for which Hedgeye and McCullough are well known in the marketplace) with McCullough, and learning that Terman was an adamant follower of the Hedgeye process.  Lamar then gave Solstein a significant portion of his family money to manage.

52.     On information and belief, Terman and Lamar discussed how they might collaborate with Dale – *i.e.*, conspire with Dale – to establish a competing business that would then develop trade signal tools and macro-economic research derived from Hedgeye's trade secrets and sell them to Terman and Solstein Capital, and other Hedgeye clients, at a fraction of the cost.

53.     In March 2021, Terman introduced Dale and Lamar.

54.     Lamar is a defendant in the federal court trade secret litigation described below.

**Terman Conspires With Dale**

55.     In March 2021, Terman contacted and spoke to Darius Dale, and conspired in a plan by which Dale would steal Hedgeye's trade secrets, Lamar would finance and manage their launch of a competing business, and the competing business would sell to Solstein Capital virtually identical research that Solstein had been buying from Hedgeye, but at a fraction of the cost.  In so doing, Terman and Solstein would have both Ryan, responsible for running the signaling component of the Hedgeye macro process, and Dale, responsible for operating and having access to the quad-framework of the Hedgeye macro process.  Through 42 Macro, Terman also would establish a new competitor to Hedgeye, further benefitting herself and

Solstein.  Terman has also continued to promote herself and Solstein Capital on CNBC using the Hedgeye process implemented through 42 Macro, while aware that Hedgeye does not approve of her doing so without crediting Hedgeye.

56.      Terman and Lamar discussed with Dale his employment with Hedgeye.  On information and belief, Terman was aware of and discussed with Dale the fact that he had employment contracts with Hedgeye that prohibited him from competing with Hedgeye while still employed, as well as clear restrictions on Dale's right to disclose Hedgeye's confidential information and trade secrets both during and after his employment.

57.      Terman knew that, should Dale follow her advice, he would be breaching his agreements with Hedgeye and breaking the law.

58.      On information and belief, Terman and Dale discussed her plan whereby Dale would steal Hedgeye's trade secrets, run a competing business that Terman would help launch, and sell to Solstein the same research that Solstein had been buying from Hedgeye.

59.      Dale told Terman and Lamar, "You're going to be blown away by the granularity and soup-to-nuts asset allocation and portfolio construction solutions I'm going to provide. . . . No one at Hedgeye has any knowledge of these solutions because it's all in my head/notebook."

60.      On information and belief, Terman urged and encouraged Dale to terminate his employment with Hedgeye, promising him direct and indirect compensation for doing so.

61.      On information and belief, Terman also encouraged and assisted Dale in stealing Hedgeye confidential information and trade secrets, promising him direct and indirect compensation for doing so.

16

62. On information and belief, until Dale and Terman had their conversations, Dale did not intend to compete directly with Hedgeye. But for Terman's encouragement, Dale would not have breached his employment agreements. Terman's encouragement also was a substantial factor in Dale's decision to do so.

63. On March 24, 2021 – after conspiring with Dale – Terman requested a call for the afternoon of Monday, March 29 to downgrade Solstein's Hedgeye subscription. Terman knew at this time that Dale would resign on Sunday, March 28 and begin servicing Solstein with Hedgeye's misappropriated trade secrets immediately thereafter.

**Defendants Launch Their Competing Business**

64. Terman was in constant contact with Dale, and actively coached him, as he negotiated his exit from Hedgeye and worked with Terman and Lamar on establishing the competing venture. They named the competing venture "42 Macro."

65. While Dale was still employed with Hedgeye, Terman gave him constant and extensive feedback and advice on how they would launch and promote 42 Macro on Twitter, LinkedIn, and by email. Terman was intimately involved in establishing 42 Macro, including making decisions about pricing, graphics, its product names and offerings.

66. On information and belief, Terman also financially supported the launch of 42 Macro and has an informal or formal ownership interest in the venture.

67. On information and belief, Terman and/or Solstein Capital are partners of 42 Macro, along with Lamar.

17

68.     On information and belief, Terman knew that she was assisting Dale in breaching his employment agreements, in breaching his fiduciary duties and breaking the law.

69.     On March 24, 2021, while Dale was still employed with Hedgeye, Lamar officially established 42 Macro by filing the "LLC Registration – Article of Organization" for 42 Macro with the California Secretary of State.

70.     On or about March 25, 2021, while Dale was still employed by Hedgeye, Dale updated his social media, including his LinkedIn profile, to say that he was a founder and CEO of 42 Macro LLC, an "online financial media company specializing in macro risk management."

71.     Terman and Dale intended that the same customers who had been paying Hedgeye for content they received from Hedgeye through Dale would shift their business from Hedgeye to 42 Macro if they knew they were getting research that was based on Hedgeye's models.  In other words, Hedgeye's customers were not just targets of Terman, Dale and Lamar; they were the prime targets.  Terman knew and intended that by supporting 42 Macro, she would damage Hedgeye.

72.     Terman did everything she could to maximize 42 Macro's success, to Hedgeye's detriment.  For example, Terman gave Dale detailed professional advice on the timing and content of his social media messaging about Hedgeye and 42 Macro.  Among other things, Terman advised Dale to simultaneously update all his various social media at once and to have content ready to publish as soon as 42 Macro went public.

73.     When Terman suggested Dale immediately start publishing content, Dale responded to her that there was a "problem with having content ready off the bat."  Dale told

Terman that doing so implies that "the models I used to produce the analysis were created while working at Hedgeye and thus would be subject to their IP claims."

74.     On March 27, while Dale was still employed by Hedgeye, Dale discussed with Terman whether he would spend his remaining time "helping [Hedgeye] transition," or "spend the time working on 42 Macro."

75.     On March 28, 2021, with Terman's knowledge, approval, encouragement and financing, Dale resigned from Hedgeye via email attaching his resignation letter.

**Defendants Acquire, Disclose and Use Hedgeye's Confidential Information and Trade Secrets**

76.     In the days and weeks before he resigned from Hedgeye, Terman conspired with Dale as to how he would build the models on which 42 Macro would be based.  Terman actively assisted Dale with building 42 Macro's models.

77.     For example, while Dale was still employed with Hedgeye, Terman invited him to edit a folder on Dropbox that was named "42 Macro."  Terman wrote, "Here is a drop box with some examples."  On information and belief, Terman knew that she was inviting Dale to breach his employment agreements.

78.     Terman also knew that Hedgeye's models were intellectual property that was owned by Hedgeye not Dale.  She explained to Dale, "[i]f you built something while at their company, technically they own it."

79.     Terman conspired with Dale as to how they might get around the "technicality" of Hedgeye owning its intellectual property, writing, "I would just make sure your lawyer gives you advice."

80.     Early Sunday morning on March 28, 2021, before Dale emailed his resignation, and working with a common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, Dale copied dozens of computer files comprising gigabytes of information from his Hedgeye work computer to his private Dropbox account in the cloud.  Dale has admitted this copying in the federal court trade secret litigation discussed below.

81.     The files that Dale copied to Dropbox consisted of Hedgeye's most valuable confidential information and trade secrets, including its proprietary and highly confidential financial models and Excels files.

82.     For example, Dale copied the files named, "Global Macro Risk Monitor.xlsx" "US INFLATION Model.xlsx," and "US GROWTH Model.xlsx."  Those files are highly confidential Hedgeye financial models and trade secrets.

83.     Dale also used his personal cell phone to take pictures of his computer screen displaying highly confidential Hedgeye models and other information,  Dale has admitted this in the federal court trade secret litigation discussed below.

84.     After his extensive copying of Hedgeye confidential information and trade secrets to his personal Dropbox, Dale and Terman both shared access to a folder in Dropbox named "42 Macro."  Terman and Solstein Capital thereby themselves directly acquired Hedgeye's confidential information and trade secrets.

85.     For example, on March 29, Dropbox notified Dale that "Nadine [Terman] made changes in your shared folders."  The document shows a partial file name of an Excel file that includes the words "Hedgeye" and "US_&_Global_GIP_Models".  The Dropbox notice also indicates that "Nadine added" that file to the 42 Macro shared folder on March 27, the day before Dale resigned from Hedgeye.

86.     Terman knew that Dale was not authorized to give her access to Hedgeye's confidential information and trade secrets.

87.     Working with a common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, Dale next copied Hedgeye's confidential information and trade secrets from his Dropbox to his 42 Macro work computer.  On information and belief, Terman accessed and used these files while helping Dale design 42 Macro's models.

88.     Working with a common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, Dale examined Hedgeye's source files in painstaking detail, building financial models for use at 42 Macro with Hedgeye's proprietary and trade secret models open literally side-by-side with 42 Macro's.  Dale's building of 42 Macro's source files was an iterative process; that is, he consulted Hedgeye's source files, built some of 42 Macro's, double-checked Hedgeye's files, and further modified 42 Macro's files.  Dale has admitted using the stolen Hedgeye files in this way in the federal court trade secret litigation discussed below.

89.     Working with a common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, Dale examined Hedgeye's confidential information and trade secrets.  Dale did so with "extreme care," paying particular attention to "the more important aspects of the

Hedgeye formulas," especially whenever they "got to a critical juncture in the development of 42 Macro's own formulas."

90.     Working with a common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, Dale also copied specific formulas from Hedgeye's source files into his own source files.  Dale has admitted this copying in the federal court trade secret litigation discussed below.

**Terman Helps Dale Hide And Destroy Evidence**

91.     Early Sunday morning before he tendered his resignation, and working with a common purpose and interest with Terman, Solstein Capital and Lamar, Dale tried to destroy the evidence of misappropriation by clearing his web browser history and leaving only traces of his Dropbox activity.

92.     Terman advised and actively worked with Dale to destroy evidence of his misconduct prior to Dale's resignation, even offering Solstein's services to help conceal his theft. For example, she told Dale that her Solstein technical team could advise him to "help you ensure Hedgeye cannot access anything from the [company] laptop you are returning."  She later emphasized, "I just did not want you to trust a Hedgeye IT person."  Dale took Terman up on her offer, asking Terman to "connect me with your tech people" because he was "cleaning" his Hedgeye laptop before returning it to Hedgeye.

93.     Similarly, after using Hedgeye's source files to create 42 Macro's source files, Dale knowingly and intentionally deleted Hedgeye's source files from his 42 Macro work computer so as to hide evidence of their misappropriation.  Dale has admitted to this destruction

of evidence in the federal court trade secret litigation discussed below.  Upon information and belief, Dale did this with Terman's active knowledge, approval and encouragement.

94.     On information and belief, Terman also discussed with Dale the importance of communicating with personal email accounts like gmail instead of Dale's Hedgeye email.  As their plans progressed, Terman and Dale determined to communicate by text, not even by gmail, so as to keep Hedgeye from learning of their misconduct.

**Terman Continues Conspiring With Dale**

95.     Terman knew that the stolen Hedgeye information was deemed by Hedgeye to be critically important, proprietary and highly confidential and trade secret.  Terman likewise viewed the Hedgeye information as highly confidential and trade secret.

96.     Dale discussed with Terman how his work at Hedgeye constituted "designing valuable IP."  Dale and Terman also discussed Dale's desire, should he leave 42 Macro, for "something that grants [him] permission to carry on using any such IP post any parting of ways."

97.     After Dale resigned, Hedgeye attempted to negotiate with him a separation agreement.  Hedgeye focused its efforts on obtaining Dale's acknowledgement as to Hedgeye's intellectual property.  Working with a common interest and purpose with Terman, Solstein Capital, 42 Macro and Lamar, Dale resisted providing such assurances.

98.     Terman gave Dale extensive feedback and counseled him on how to manage his departure from Hedgeye so as to minimize suspicion, while simultaneously initiating negotiations with Hedgeye to reduce her subscription fees to Hedgeye.  When Hedgeye insisted that Dale agree to honor his obligations regarding Hedgeye intellectual property and confidential

23

information, Dale forwarded for Terman's and Lamar's review and comment the draft separation agreements he was negotiating with Hedgeye.

99.     On March 31, 2021, Hedgeye again sought Dale's acknowledgment regarding Hedgeye intellectual property and trade secrets.  Dale discussed Hedgeye's proposal with Terman and Lamar, who gave detailed advice on how Dale should negotiate with Hedgeye, ultimately strongly urging Dale to reject Hedgeye's amended separation proposal.  Dale did so, even while acknowledging that "specific algorithms" qualify for trade secret protection.

100.     Meanwhile, Terman strategized with Dale as to how she would quash suspicion amongst the rank and file at Solstein Capital.  She told Dale that she would explain to her team "the importance of [Hedgeye's] quad framework," and how she had Solstein "signed up for his new research service" so that "we'll continue to get his quad data once he sets up his frameworks in a few weeks."

101.     On information and belief, Terman knew that 42 Macro would not only be competitive with Hedgeye because it was based on stolen Hedgeye trade secrets, and intended to offer identical services to the market, but also because Dale was intentionally sabotaging Hedgeye.  For example, Dale took one critical file that Hedgeye was able to recover only after a federal court issued a temporary restraining order requiring Dale to return the file.  In other words, Dale did not just "copy" a particularly important file of Hedgeye's, he actually destroyed Hedgeye's only copy.

102.     Before he resigned from Hedgeye, Terman discussed with Dale the competitive advantage that 42 Macro would have.  Dale told Terman and Lamar that "No one at Hedgeye has any knowledge of these solutions . . . .  At best, I'm leaving them with what will soon become an

24

admittedly-popular-but-antiquated set of forecasting and backtesting tools. . . . At worst, I'm leaving them with tools they have no idea how to employ."

103.    Similarly, Dale told Terman and Lamar his view that in the week he resigned, Hedgeye had "been sending out the same file of stale model data all week. They don't actually have access to the nowcasts; they're on my hard drive."

104.    Recognizing the likelihood of litigation should they be discovered, Dale continued explaining to Terman and Lamar that "[Hedgeye] will get the models back, but [with] only limited knowledge of how to use them . . . . Oh well, his loss = our gain."

**Terman Steals Hedgeye's Curated Customer Lists**

105.    Working with a common purpose and interest with Terman, Solstein Capital and Lamar, Dale also copied Hedgeye's highly confidential and trade secret customer lists.  For example, Dale copied confidential and trade secret files containing curated lists of the names of Hedgeye's highest paying clients at every level of the Macro business.

106.    As Dale was negotiating his exit from Hedgeye, he discussed with Terman and Lamar that he would broadly issue a public statement both explaining his departure from Hedgeye and plugging their new venture.  Dale, Terman and Lamar considered multiple versions, including one with a fabricated critical portrayal of his separation negotiations that Dale contemplated sending "if severance negotiations end poorly."

107.    Dale threatened Hedgeye that he would use his standing as "a very reliable source in the dead center of the … [Hedgeye] community" as "a loaded gun full of uncomfortable truths."

25

108.     In anticipation of carrying through on his threats and sending the scathing email he discussed with Terman and Lamar, and with a common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, Dale uploaded over 11,000 contacts from Hedgeye's master list of contacts into his personal "My Contacts" list in Hedgeye's StreetContxt system. To disguise his actions, Dale then copied all of the contacts to another personal folder, named for a local charity that Dale was known to be associated with, and which previously had only 65 contacts.  Dale then exported the list to himself from the folder named for the charity.

**Terman Steals Hedgeye's Confidential Notebooks**

109.     As per direction from Hedgeye CEO Keith McCullough, Dale was required to observe and copy McCullough's proprietary method of note-taking, and therefore Dale created and maintained Hedgeye notebooks regularly throughout the course of his employment with Hedgeye, and went through many composition notebooks over the years.

110.     While he was still working for Hedgeye, Dale used his personal cell phone to take pictures of Hedgeye's confidential information in the notebooks.  Dale took pictures, and emailed to his personal email address, confidential information contained in several different notebooks, including a notebook that Dale maintained in 2021.

111.     When Dale resigned from Hedgeye, and working with a common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, Dale violated his employment agreements, and misappropriated Hedgeye confidential information and trade secrets, by failing to return several notebooks he had removed from Hedgeye.

112.    In the federal court trade secret litigation discussed below, Dale has admitted that he took a number of his Hedgeye notebooks and failed to return them even after the Court expressly ordered him to do so.

**Defendants' Unfair Competition**

113.    42 Macro's sole business consists of selling research based on the stolen Hedgeye confidential information and trade secrets financial models.

114.    Terman worked closely with Dale to micromanage the launch of 42 Macro to ensure it would have maximum impact on the market.

115.    On April 26, 2021, Terman and Solstein Capital, through 42 Macro, began publishing content based on models derived from Hedgeye's trade secret source models.

116.    Terman and Solstein Capital obtain the fruits of the stolen Hedgeye information by "purchasing" it from 42 Macro.  In anticipation of receiving 42 Macro's research results, and even before Dale's departure was formally announced, Terman and Solstein Capital suggested that Hedgeye would no longer be able to deliver the macro research it had provided for years, and scheduled meetings to discuss cancelling their institutional subscription with Hedgeye.

117.    Terman and Solstein Capital get from 42 Macro what Dale claims is the same research that Hedgeye produces from its trade secret financial models.  For example, when asked, "What tools are you using to create your models," Dale responded, "The same one I've been using for the last 12 years," *i.e.*, the same ones Dale had been using at Hedgeye.

118.    Given the amount of time and effort required to develop the types of models that Terman is presenting on behalf of 42 Macro, Dale could not possibly have developed 42 Macro's

models independently and without employing Hedgeye's proprietary and confidential

information and trade secrets.  Dale has publicly admitted that he "built [42 Macro's models]

over 12 years," *i.e.*, while he was employed at Hedgeye.

**Hedgeye's Harm and Defendants' Unjust Enrichment**

119.    Customers instantly recognized that 42 Macro's products appear identical to

Hedgeye's.  Customer have publicly asked, "Where can we see how your process will

differentiate from Hedgeye?"  Dale, working with common purpose and interest with Terman,

Solstein Capital, 42 Macro and Lamar,  assures customers that 42 Macro provides the same

research that Hedgeye provides:  "The easiest way to spot the differentiation is that . . . Dale no

longer works at Hedgeye."  In other words, Dale markets 42 Macro's research by emphasizing to

Hedgeye's customers that what they used to buy from Hedgeye, they now can buy from 42

Macro, and indeed only from 42 Macro.  Dale tells Hedgeye's customers, "Firms don't produce

research, research analysts produce research for firms," and "Firms don't produce research;

analysts do."

120.    Other Hedgeye subscribers have asked why 42 Macro is using terminology that

are "Hedgeye terms."  One customer reported that, "Some of us feel like children of divorce and

are confused.  I love you (*i.e.,* Dale) and @KeithMcCullough," the CEO and co-founder of

Hedgeye.

121.    Similarly, in response to a tweet which stated, "No one does a better job modeling

the cycle than Hedgeye," Dale, working with a common purpose and interest with Terman,

Solstein Capital, 42 Macro and Lamar, responded "And the guy who built and maintained all

those forecasting tools sweeps and mops the floors at @42macro now."

28

122.    When customers expressed admiration for Hedgeye's models, Dale, working with common purpose and interest with Terman, Solstein Capital, 42 Macro and Lamar, tried to dissuade them from doing business with Hedgeye, publicly stating "Just a reminder, however, the guy that built and maintained all of @hedgeye's macro regime #forecasting tools no longer works there."

123.    Through Defendants' efforts, Hedgeye has lost customers, including Solstein Capital. For example, some subscribers confirmed on Twitter their intent to switch from Hedgeye to 42 Macro. One user responded to @42macroDDale: "Any hints on timeframe and pricing structure? I want to plan which of my current subscriptions I am going to cancel to afford yours. Huge fan! Can't wait to see what you're cooking up."

124.    Further, at least one current Hedgeye institutional client and one former Hedgeye institutional client and current mass market client, informed Hedgeye that Dale asked them to provide a testimonial and reference for 42 Macro.

125.    The financial impact of Defendants' unfair competition has been and will continue to be substantial. In addition to the financial impact, Hedgeye is being irreparably harmed. Multiple Hedgeye customers already have switched from Hedgeye to 42 Macro. A large but unknown number of customers would be Hedgeye customers, but they are not, because of Defendants' unfair competition. Hedgeye also has been forced to expend substantial money, time, and other resources as a result of Defendants' misconduct.

**Federal Court Trade Secret Litigation**

126.     On April 26, 2021, Hedgeye sued Darius Dale in the Southern District of New York federal court, alleging Dale's misappropriation of Hedgeye trade secrets, breach of his employment agreements and unfair competition.

127.     On information and belief, Terman was and is aware of all the papers that have been filed, and orders that have been issued, in the federal court trade secret litigation.

128.     Contemporaneously with filing its lawsuit, Hedgeye also sought a temporary restraining order ("TRO"), and submitted some of the substantial evidence it had uncovered. The Court issued a TRO the next day.  The TRO ordered Dale to return to Hedgeye material, specifically including financial models and notebooks.  It also ordered Dale to "preserve and forebear from accessing or in any way using any and all copies" of Hedgeye's files.

129.     Notwithstanding the Court's order, 42 Macro continued doing business as usual, publishing daily installments of research derived from the stolen Hedgeye models.

130.     Hedgeye moved the Court to stop 42 Macro from further publishing results derived from Hedgeye's models.  In response, Dale gave false sworn assurances that he had built 42 Macro's models "from scratch," and that after he copied Hedgeye's models to his Dropbox, he had not further accessed or disclosed them.

131.     On June 15, 2021, Dale testified under oath that he had earlier lied to the Court in his sworn statement.  Although he had said he only downloaded Hedgeye's files to his Dropbox, and had done nothing further, he now admitted that he actually further copied Hedgeye's files to the laptop he was using to build and run 42 Macro.

132.    Dale also admitted that, contrary to his earlier sworn statements to the Court, he actually had knowingly and deliberately studied the substance of Hedgeye's source models in detail while building 42 Macro's source models, with Hedgeye's proprietary models open literally side-by-side with 42 Macro's.

133.    Dale also admitted that, after using Hedgeye's models, he then intentionally deleted the Hedgeye files that he had copied onto his personal laptop that he used when constructing 42 Macro's source models.

134.    When Hedgeye alerted the Court that Dale had admitted earlier lying under oath, Dale insisted that although he had earlier lied, and destroyed evidence of his lies, he had only consulted Hedgeye's source files while building 42 Macro's, and he had never actually copied anything from Hedgeye's source files into 42 Macro's.   Dale and his attorneys repeatedly proclaimed to the Court, "It is one thing to view a source file, but quite another thing to draw upon and employ its content . . .   Dale was clear that he did not draw from any content included [in] those [Hedgeye] files . . .   Merely opening a file and reviewing its content is far removed from actually incorporating and using the same content in a rival product."

135.    But on August 27, 2021, Dale admitted that he had lied again.   For the first time, contrary to what he had repeatedly assured the Court, Dale admitted to "copying formulas" directly from Hedgeye's models to 42 Macro's.   He also admitted to having copied partial lists of ticker symbols from Hedgeye's models into 42 Macro's.

136.    Though the Court entered the TRO on April 27, Dale and 42 Macro continued using the models with the Hedgeye formulas continuing into May.   Ultimately Dale admitted that sometime thereafter, he again violated the TRO by further accessing the files to intentionally

31

delete "large numbers" of the previously copied Hedgeye formulas and ticker symbols, thereby attempting to further destroy evidence of their theft of Hedgeye's models.

137.    Dale also certified that, after the Court issued its TRO, he returned all Hedgeye models, and he later confirmed under oath on June 15 that he had returned all Hedgeye confidential information, specifically including its financial models and notebooks.

138.    Dale's certification to the Court, and sworn statements, were lies. Dale had not, for example, returned the 2021 notebook. When confronted, Dale suggested the notebook must have been lost, and that "these things go missing all the time."

139.    Five weeks later, however, Dale admitted that he had failed to return two additional Hedgeye notebooks, including the 2021 notebook. Dale refused to provide any explanation as to why he had not produced them earlier when ordered by the Court.

140.    On August 27, after having repeatedly assured the Court under oath that he had diligently searched for and returned all Hedgeye files, Dale admitted that he had still been lying. Dale then produced to Hedgeye over 12,000 additional electronic documents, including over 5,000 files that hit on the keyword "Hedgeye," and 644 files with "Hedgeye" in the file name. At least 30 files that Dale produced on August 27 were listed by name and were expressly ordered to be produced in the Court's April 27 TRO. Dale has never explained where the documents were found and why they were not produced earlier.

141.    In December 2021, in conducting discovery in the federal court trade secret litigation, Hedgeye became aware of Terman's and Solstein Capital's actions described above. Dale and Lamar had not earlier disclosed their involvement though required to do so by law.

142.    Hedgeye has no adequate remedy at law.

**FIRST CAUSE OF ACTION**

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)**

143.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

144.    Hedgeye's trade secrets include, as described above, its financial models in the form of Excel spreadsheets, its notebooks, and its customer lists.  All those trade secrets relate to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transcript in interstate commerce across the country and throughout the world.

145.    Hedgeye's trade secrets as described above thus constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

146.    Hedgeye's trade secrets derive both actual and potential economic value from not being generally known to Hedgeye's competitors, and from not being readily ascertainable through proper means by Hedgeye's competitors.

147.    At all relevant times, Hedgeye has taken reasonable measures to protect the secrecy of its trade secrets that Defendants have misappropriated, including those referred to above.

148.    Defendants' actions, as set forth above, constitute misappropriation within the meaning of 18 U.S.C. § 1839(5) because Defendants acquired Hedgeye's trade secrets through Dale, as described above.

149.    Defendants acquired the trade secrets through improper means and Defendants had reason to know, and did know, that they acquired the trade secrets through improper means.

150.    Defendants' actions also constitute misappropriation within the meaning of 18 U.S.C. § 1839(5) because Defendants disclosed Hedgeye's trade secrets as described above.

151.    Defendants' actions also constitute misappropriation within the meaning of 18 U.S.C. § 1839(5) because Defendants used Hedgeye's trade secrets as described above.

152.    Defendants disclosed and used Hedgeye's trade secrets without Hedgeye's express or implied consent.  Defendants knew they did not have Hedgeye's consent.

153.    Defendants knew that Dale had contractual, fiduciary and statutory duties prohibiting him from acquiring, disclosing or using the trade secrets.

154.    Defendants acquired, disclosed and used Hedgeye's trade secrets with the intention and effect of causing Hedgeye both economic and intangible harm.

155.    Defendants' misappropriation has proximately caused damages to Hedgeye, including but not limited to lost profits, goodwill, competitive advantage, and business opportunities.

156.    Defendants have been unjustly enriched as a further proximate result of their misappropriation of Hedgeye's trade secrets.  For example, Defendants were unjustly enriched because 42 Macro got an illegal "head start" by virtue of stealing Hedgeye's models.  Defendants were unjustly enriched, at a minimum, to the same extent that they made profits from purchasing 42 Macro's research based on stolen Hedgeye models.

34

157.    Defendants also have been unjustly enriched by receiving the benefit of Hedgeye's research process through misappropriation at no cost, or a fraction of the cost, that Hedgeye would charge Defendants for the research.

158.    Defendants' actions in misappropriating Hedgeye's trade secrets was intentional, willful, wanton, reckless and malicious and warrants exemplary damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C), and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

159.    Hedgeye also is entitled to preliminary and permanent injunctive relief to protect its confidential and trade secret information by prohibiting Defendants from (1) further purchasing research based on stolen Hedgeye financial models, and (2) financing and otherwise assisting Dale, Lamar and 42 Macro with their ongoing misappropriation.

## SECOND CAUSE OF ACTION
### (Interference with Contract)

160.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

161.    Hedgeye and Dale entered into valid employment agreements supported by adequate consideration.

162.    On information and belief, Terman was aware of Dale's employment contracts, and of their terms.

163.    On information and belief, Terman knew those employment contracts with Hedgeye prohibited Dale from competing with Hedgeye while still employed.  Notwithstanding

her knowledge of Dale's employment agreements, Terman intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

164.    On information and belief, Terman knew that Dale had agreed that anything he created during the course of his employment at Hedgeye, specifically including financial models, were deemed "works made for hire" and belonged to Hedgeye, not Dale, notwithstanding his role in creating them.  Notwithstanding her knowledge of Dale's employment agreements, Terman intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

165.    On information and belief, Terman knew that Dale had agreed with Hedgeye not to disclose confidential information, "including without limitation, financial information . . . and proprietary investment and trading strategies of" Hedgeye during or after his employment with Hedgeye.  Notwithstanding her knowledge of Dale's employment agreements, Terman intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

166.    On information and belief, Terman knew that Dale had agreed with Hedgeye that, while employed, he would "not to engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company of its affiliates." Notwithstanding her knowledge of Dale's employment agreements, Terman intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

167.    On information and belief, Terman knew that Dale had agreed not to "assist any other person or organization in competing (directly or indirectly) with the Company or any of its affiliates, or in preparing to engage in competition with the business or proposed business of the Company or any of its affiliates." Notwithstanding her knowledge of Dale's employment agreements, Terman intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

168.    As a direct and proximate result of Defendants' intentional interference, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.

169.    Defendants' conduct was intentional, willful, wanton, reckless and malicious and warrants punitive damages.

## THIRD CAUSE OF ACTION

### (Unfair Competition)

170.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

171.    By doing the things described above, Defendants have engaged in unfair competition by misappropriating the results of the labor, skill, and expenditures of Hedgeye.

172.    In misappropriating Hedgeye's trade secrets and confidential information, Defendants acted in bad faith, exploiting commercial advantage which belonged exclusively to Hedgeye.

173.    As a direct and proximate result of Defendants' intentional interference, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.  Defendants also have been unjustly enriched as a further proximate result of their unfair competition.

174.    Defendants' conduct was intentional, willful, wanton, reckless and malicious and warrants punitive damages.

## FOURTH CAUSE OF ACTION (SOLSTEIN CAPITAL ONLY)
### (Breach of Contract)

175.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

176.    Hedgeye and Solstein Capital entered into a valid and enforceable contract ("Services Agreement") with Hedgeye, supported by adequate consideration.

177.    Pursuant to the Services Agreement, Solstein Capital was prohibited from soliciting Hedgeye employees during the term of the Services Agreement, or from employing Hedgeye employees for twelve (12) months after the employee's termination.  On information and belief, Solstein Capital breached this provision by soliciting Dale while he was still a Hedgeye employee.

178.    Pursuant to the Services Agreement, Solstein Capital undertook a number of obligations with regard to Hedgeye's intellectual property.  For example, via incorporation by reference of Hedgeye's website Terms of Service, Solstein Capital was prohibited from:

- Infringing on Hedgeye's intellectual property in using the Website or Services;

- Modifying or creating derivative works of the Services or Content or any part thereof;

- Doing anything that adversely affects the Website, the Services or the Company's business;

- Reverse engineering the Services or any Content available in connection with the Services; and

- Circumventing security measures.

179.    On information and belief, Solstein Capital breached all of these prohibitions by inducing Dale, and conspiring with him, to misappropriate Hedgeye's confidential information and trade secrets as set forth above.

180.    Hedgeye fully performed under the Services Agreement, and/or its performance was excused.

181.    As a direct and proximate cause of Solstein Capital's breach of the Services Agreement, Hedgeye was damaged and harmed by the loss of customers and profit, goodwill, competitive advantage, and business opportunities.

182.    As a direct and proximate cause of Solstein Capital's breach of the Services Agreement, Defendants have been unjustly enriched.

**FIFTH CAUSE OF ACTION (TERMAN ONLY)**

**(Interference With Services Agreement)**

183.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

184.     Hedgeye and Solstein Capital entered into a valid and enforceable services contract ("Services Agreement").

185.     Terman was aware of the Services Agreement, and its terms.  Terman signed the Services Agreement on behalf of Solstein Capital.

186.     Terman knew the Services Agreement prohibited Solstein Capital from infringing on Hedgeye's intellectual property, soliciting its employees for twelve (12) months following the employee's termination and misappropriating Hedgeye's confidential information and trade secrets.

187.     Notwithstanding her knowledge of the Services Agreement, Terman caused Solstein Capital to breach the agreement as set forth above.

188.     As a direct and proximate result of Terman's intentional interference, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.

189.     Terman's conduct was intentional, willful, wanton, reckless and malicious and warrants punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.     For an Order prohibiting Defendants from (a) further purchasing research based on stolen Hedgeye financial models, (b) financing and otherwise assisting Dale, Lamar and 42 Macro with their ongoing misappropriation; and (c) further misappropriating any of Hedgeye's proprietary, confidential or trade secret information;

2.      For an order directing Defendants to account for, and to pay over to Hedgeye, all

gains, profits and advantages derived by Defendants from the above-described wrongful acts;

3.      For an award of monetary damages sustained by Hedgeye as a result of

Defendants' unlawful conduct, in an amount to be proved at trial;

4.      For an order multiplying or otherwise enhancing any award because of

Defendants' willful and deliberate wrongdoing described herein;

5.      For an award of punitive damages resulting from Defendants' intentional, willful,

wanton, reckless and malicious conduct;

6.      For an award of costs of this action and Hedgeye's reasonable attorneys' fees

incurred herein by Hedgeye; and

7.      For an award of such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so-triable.


Dated: June 1, 2022                          /s/ Eric A. Prager

                                                  VENABLE LLP
Eric A. Prager
1270 Avenue of the Americas
New York, NY 10020
Tel.: 212-307-5500
Fax: 212-307-5598
eaprager@venable.com

Thomas E. Wallerstein
*(pro hac vice forthcoming)*
101 California Street, Suite 3800
San Francisco, CA 94111
Tel: 415-653-3750
Fax: 415-653-3755
twallerstein@venable.com

*Attorneys for* Hedgeye Risk Management, LLC