**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| HEDGEYE RISK MANAGEMENT, LLC, | : | |
| | : | No. 1:22-cv-01113-ALC-RWC |
| Plaintiff, | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| DARIUS DALE, STEVEN LAMAR, 42 | : | |
| MACRO, LLC, NADINE TERMAN, AND | : | |
| SOLSTEIN CAPITAL, LLC | : | |
| Defendants. | : | |
| | : | |

## SECOND AMENDED COMPLAINT

Plaintiff Hedgeye Risk Management, LLC ("Hedgeye") brings this suit against

Defendants Darius Dale, 42 Macro, LLC ("42 Macro"), Steven Lamar, Nadine Terman and

Solstein Capital, LLC ("Solstein") (collectively, "Defendants") and alleges Defendants' (1)

Violation of the Defend Trade Secret Act, 18 U.S.C. § 1836, *et seq.*; (2) Common Law

Misappropriation; (3) Breach of Contract (against Dale only); (4) Intentional Interference with

Contractual Relations (against Lamar, 42 Macro, Terman and Solstein only); (5) Breach of

Services Agreement (against Solstein only); (6) Interference with Services Agreement (against

Terman only); and (7) Unfair Competition.

### SUMMARY OF THE ACTION

Hedgeye brings this Second Amended Complaint to remedy and prevent Defendants'

past, ongoing and further misappropriation of Hedgeye's confidential and proprietary

information and trade secrets.  Defendants acted and act collaboratively and with a common interest and purpose, and each Defendant took individual, active steps of misappropriation.

Hedgeye hired Defendant Darius Dale straight out of college in 2009.  Dale rose through the ranks and in 2015 was promoted to Director and in 2017 to Managing Director.  By the time Dale resigned in 2021, he was one of Hedgeye's most trusted and well-compensated employees, earning more in salary, bonus and ownership distributions than all of his colleagues.

Dale resigned from Hedgeye on Sunday, March 28, 2021.  That morning, working with a common purpose and interest with the other Defendants, Dale copied dozens of computer files comprising gigabytes of information from his Hedgeye computer to his private Dropbox account. Included were Hedgeye's core proprietary financial models that underlie Hedgeye's flagship products and services.  Dale also took with him several notebooks containing daily, detailed notes describing Hedgeye's proprietary process and calculations, and further contain highly confidential information on Hedgeye customers and meetings with those customers.  Further, acting with a common purpose and interest, Defendants through Dale also secretly downloaded Hedgeye's carefully curated client list.

Just days before Dale resigned, Lamar and Terman (a Hedgeye customer through her company Solstein Capital) established Defendant 42 Macro, LLC.  Terman intended to partner with 42 Macro to benefit her company Solstein Capital, which would immediately terminate its relationship with Hedgeye and obtain identical products and services from 42 Macro.

Every day, week and month, 42 Macro sells those products and services to customers who presumably otherwise would be Hedgeye customers, including Terman and Solstein Capital themselves.  Hedgeye's losses are measured in many millions of dollars to date.

Dale has admitted to downloading Hedgeye's key proprietary financial models, client lists with thousands of contacts, and other proprietary and confidential information to the personal computer that Defendants used to create 42 Macro's financial models.  Dale and 42 Macro currently operate under a preliminary injunction of this Court.

**PARTIES**

1.      Hedgeye Risk Management, LLC, is a Delaware limited liability company with its principal place of business located at 1 High Ridge Park, Stamford, CT 06905.

2.      Darius Dale is an individual who resided at 134 East 22nd Street, Apt 508, New York, NY 10010 when the original Complaint was filed and, upon information and belief, now resides in Albany, New York.

3.      Steven Lamar is an individual who resides at 1877 Centro West, Tiburon, CA 94920.

4.      42 Macro, LLC is a California limited liability company with its registered office at 1877 Centro West, Tiburon, CA 94920.  Upon information and belief, Lamar is the sole owner of 42 Macro and the sole managing member and/or director.

5.      Upon information and belief, Lamar operates and has complete control of 42 Macro.  Upon information and belief, 42 Macro is a mere instrumentality and alter ego of Lamar. Upon information and belief, Lamar comingles funds with 42 Macro, including by making payments on behalf of 42 Macro from his personal accounts, and holds himself out as liable for the debts of 42 Macro.  Upon information and belief, Lamar and 42 Macro conduct their busines affairs from the same office space (house) and have the same single employee (Dale).  Upon information and belief, Lamar uses 42 Macro as a shell or conduit for his own affairs.  Upon

information and belief, Lamar has exclusive control of all 42 Macro corporate finances and accounting, and Lamar alone has (under)ized 42 Macro.  Upon information and belief, 42 Macro disregards corporate formalities.  For example, upon information and belief, there are no corporate documents or meeting minutes that memorialize the ownership interests or ization of 42 Macro, and there is no operating agreement that governs the business of 42 Macro.

6.      Thus, Lamar and 42 Macro are alter egos of one another.  Lamar and 42 Macro have such unity of interests that there is no practical distinction between them, and it would be inequitable to honor the corporate veil of 42 Macro or to treat the acts alleged in this Second Amended Complaint as those of 42 Macro alone.

7.      Nadine Terman is an individual who, upon information and belief, resides in Palo Alto, CA.

8.      Solstein, LLC, is a Delaware limited liability company with its principal place of business at 1285 El Camino Real, Suite 100, Menlo Park, CA 94025.

9.      Terman is a founder, Chief Executive Officer and Chief Investment Officer of Solstein.  All the actions she is alleged to have undertaken were taken by her in those capacities as well as in her individual capacity.  At all relevant times Terman was acting within the scope of her employment and as an agent for Solstein.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  On information and belief, this Court

also has original diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  This Court also has

supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Dale

resided in New York, New York, which is located in the Southern District of New York, at the

commencement of this action.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b),

inter alia, because a substantial part of the events giving rise to the claims occurred in this

District.  Specifically, Hedgeye's misappropriated trade secrets and confidential information

were acquired, disclosed and used in this District.  Defendants further disseminated the

misappropriated trade secrets and confidential information from, and to, this District.  Hedgeye's

misappropriated trade secrets and confidential information also remained in this District on one

or more hard drives or other electronic devices in the possession of Defendants for much of the

time this action has been pending.

12.    Personal jurisdiction over these Defendants is proper due to their targeted actions

in this District.  At all relevant times, Dale lived and worked in this District.  At all relevant

times, 42 Macro operated from this District.  At all relevant times, Lamar, Terman and Solstein

directed to this District, and received from this District, all communications relating to their

misappropriation of Hedgeye's trade secrets.

13.    During key relevant times, each Defendant was an active participant in

misappropriating Hedgeye's trade secrets from this District.  For example, each Defendant

solicited Dale in this District to breach his employment agreement.  Each Defendant worked with

Dale, in this District, to acquire Hedgeye's trade secrets from this District.  Each Defendant

advised and assisted, in this District, with "wiping," in this District, the laptop they used to misappropriate Hedgeye's trade secrets.

14.     Each Defendant also acted with a common interest and purpose to misappropriate Hedgeye's trade secrets.  They agreed and conspired to undertake all the actions in this District outlined above in furtherance of their misappropriation of trade secrets from this District.

15.     On information and belief, at all relevant times Terman and Solstein Capital regularly conducted business in this District.  Solstein represents that "as of March 2022," she has at least two "clients based in New York , , , ,"  Terman and Solstein also have received the results of Hedgeye's trade secrets from 42 Macro in and/or from this District and subsequently used that research to target and sell to customers and potential customers in this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

**Hedgeye**

16.     Hedgeye was founded in 2008 by CEO Keith McCullough and President Michael Blum.  Hedgeye met its mission to create something that didn't then exist: hedge fund-quality research for everyday investors.  Hedgeye has evolved into the premier unbiased and uncompromised investment research house among the world's institutional investors.  Its institutional customer base advises over $10 trillion in assets.  The Hedgeye team features some of the world's most well-qualified and highly regarded research analysts, with extensive experience.  It continues to grow with over 70 full-time employees, 40 of which are research analysts and institutional sales professionals.

17.     Hedgeye commands both breadth and depth in its unique research offering.  The firm's flagship offering is macro-economic risk management with fundamental research

coverage across nearly 20 sectors, including Restaurants; Consumer Staples; Retail; Gaming, Leisure & Lodging; Financials; Housing; Healthcare; Industrials; Materials; Technology; Communications; REITS; Demography; China; Cannabis; Legal Catalysts and Policy.

18.     Since 2013, Hedgeye has been broadcasting HedgeyeTV over the Internet from its primary studio in Stamford, CT.  Through its rapidly growing subscriber base and marketing channels (including social media), Hedgeye reaches an audience of over 500,000 investors predominantly in the United States and also in nearly 100 countries around the world.

19.     Hedgeye develops and uses proprietary financial models that are critical to Hedgeye's business.  Hedgeye's "Growth, Inflation & Policy" model, or GIP, is a core model that was developed and iterated upon by Hedgeye's Founder & CEO McCullough over his many years of experience in the financial services industry, including as a portfolio manager.  Upon starting Hedgeye in 2008, McCullough and his team formalized and productized the GIP Model and it became one of the core products of the new firm.

**Defendant Dale**

20.     Dale is a former Managing Director at Hedgeye who managed Hedgeye's relationship with Terman and Solstein.

21.     Dale was hired by Hedgeye as a junior analyst in the summer of 2009, fresh after graduating with a Bachelor of Arts from Yale.  By early 2010, Hedgeye was focused on teaching Dale its research process and methodology, and various skills such as Excel spreadsheet modelling, statistics and probability theory, fractal mathematics, and more.  In due course, Dale's primary responsibility was helping productize and market the GIP Model, and he had daily

responsibility for ensuring data was updated and outputs were produced and published to Hedgeye's subscribers.

22.     Dale was handsomely compensated.  Each year, he was given raises and annually increasing bonuses. Year in and year out, Dale's base and bonus compensation would be at, or near, the very top of his peer group.  By 2013, Hedgeye had accepted Dale as an equity holder in Hedgeye's parent company through a phantom equity plan, making Dale one of the youngest equity holders in Hedgeye's history.  Over time, Dale was awarded enough equity to become the largest holder of phantom equity at Hedgeye.

23.     Dale was promoted to Director in 2015 and Managing Director in 2017.  By 2019, Dale was one of the highest paid employees at Hedgeye, earning the second highest bonus at the firm.  His compensation exceeded that of his colleagues, many of whom had vastly more experience in the finance industry.  In 2020, Dale was the fifth highest paid employee at Hedgeye, when taking into consideration base salary, bonus and ownership distributions.

24.     Dale's compensation, bonuses and promotions were made on the basis of his merit to the research team, notwithstanding certain instances of poor judgment and disruption.

25.     Prior to his departure from Hedgeye discussed below, Dale worked closely with McCullough to run Hedgeye's Macro quad-based framework.

**Dale's Employment Agreements**

26.     Dale initially was hired pursuant to an employment letter agreement dated July 17, 2009.  That agreement was replaced by an employment agreement dated March 8, 2010 ("Employment Agreement").

27.     Pursuant to Dale's Employment Agreement, Dale agreed not to disclose confidential information, "including without limitation, financial information . . . and proprietary investment and trading strategies of" Hedgeye before or after his employment.  Dale agreed not to compete or prepare to compete with Hedgeye during his employment.  Dale agreed not to solicit any of Hedgeye's customers during, or for six months after, his employment.  He further agreed that all inventions, discoveries, ideas, programs, notes, charts, and other materials that he created during the course of his employment were to be deemed "works made for hire" and belonged to Hedgeye.  Dale has breached each of these agreements.

28.     Dale also agreed that, while employed, he would "not to engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company of its affiliates."  He also agreed not to "assist any other person or organization in competing (directly or indirectly) with the Company or any of its affiliates, or in preparing to engage in competition with the business or proposed business of the Company or any of its affiliates."

29.     Dale also agreed that, while employed and for a period of six months afterward, he would not "hire, engage, offer to hire, divert, entice away, solicit or in any other manner persuade or attempt to persuade ("Solicitation") any person who is, or was, at any time within the twelve (12) months prior to such Solicitation, an officer, director, employee, agent, consultant, licensor, licensee, customer, or supplier of the Company or any of its affiliates to discontinue, terminate or adversely alter his, her or its relationship therewith."

30.     As a condition of his employment, Dale also was bound by Hedgeye's Code of Ethics, which was distributed to Dale and all employees.  The Code of Ethics acknowledges that

Dale owes "a duty of loyalty to the Firm," and reaffirms that he "must only use Firm confidential information for authorized purposes."

31.     Each employee, including Dale, also was required to submit an annual "Year End Attestation" certifying compliance with Hedgeye's Code of Ethics.  In Dale's 2020 Year End Attestation, executed on January 5, 2021, Dale certified that he had received, read, and understood the Code of Ethics, and that he "will comply with the letter and spirit of the Code of Ethics fully."

32.     As part of his Employment Agreement, Dale also agreed that all "inventions, discoveries, ideas, computer programs, programs based upon or developed from computer programs, including any improvements, codes, system documentation, technical data, drawings, flow charts, prototypes, design specifications, and any other documentation, notes and materials" made by him during the course of his employment and "in any way related to any business in which the Company is engaged . . . shall be deemed to be 'works made for hire' pursuant to applicable law and shall belong to the Company.

33.     As Managing Director, Dale was Hedgeye's largest holder of phantom equity and worked closely with Hedgeye's CEO, Keith McCullough.  Dale operated with virtually no supervision and was afforded a tremendous amount of autonomy.  As a result of his role, Hedgeye entrusted Dale with unfettered access to nearly all of Hedgeye's proprietary and confidential information and trade secrets.

34.     Hedgeye personnel would occasionally ask Dale to generate an output model for their use.  But Dale controlled the active source models on his desktop and no other employee had access to Hedgeye's most current versions of those models.  Source models were not shared

internally or externally, meaning Dale had sole access.  Even the client-facing output models were provided only under a limited license and could not be republished pursuant to Hedgeye's service agreement (for institutional clients), disclaimers and website Terms of Service (for retail or mass market subscribers).

**Hedgeye's Proprietary and Confidential Information and Trade Secrets**

35.     Hedgeye is a publisher of financial market and economic analysis.  Hedgeye develops and uses proprietary financial models that facilitate insights and recommendations after incorporating and weighing a vast number of carefully selected data points.  These models are critical to Hedgeye's business

36.     Hedgeye's "Growth, Inflation & Policy" model, or GIP, is a core Hedgeye "source model" that was developed and iterated upon by Hedgeye's Founder & CEO McCullough over his many years of experience as a portfolio manager to major hedge funds on Wall Street.  Over time, McCullough and his team formalized and productized the GIP Model and it became one of the core Hedgeye flagship macro-economic research offerings.

37.     Hedgeye's "source models" are dynamic market and economic analysis engines built into Excel spreadsheets.  The spreadsheets use APIs (Application Programming Interfaces) to dynamically gather virtually real-time financial marketplace and economic data from a number of sources.  Hedgeye selects dozens of discrete data points from a near-infinite number of potential inputs from virtually every country in the world, to which Hedgeye assigns varying weights.  The proprietary source models then apply mathematical formulas that Hedgeye has developed to carefully weigh, combine, and analyze the data, and feed the results to "output models."  The selection, combination, and weighting of those data points are Hedgeye trade

11

secrets.  Hedgeye sells to its subscribers investment recommendations and comprehensive financial market and economic research and analysis based on its models, and it shares the output models with certain institutional subscribers.

38.     Subscribers who receive the output models cannot access the source models on which they are based.  Subscribers cannot, for example, view the underlying methodology that goes into the source models, update the output models, etc.  Subscribers do not have access to or visibility into how Hedgeye's algorithms work or derive information.

39.     Hedgeye's financial models include Hedgeye's proprietary combination of specific sources from which economic data is gathered, the weights given to the data, the combination of the weighted data, and the internal functioning of its dynamic market and economic analysis engines.

40.     Hedgeye's proprietary models allow Hedgeye to develop both a highly accurate real-time assessment of near-term economic and inflation momentum, as well as a high-probability scenario for where growth and inflation are likely to trend over the next twelve months.

**Development Of Hedgeye's Trade Secrets**

41.     Hedgeye began developing its financial models early in the firm's history and the models have evolved over time.  The GIP, and related source models, are the "crown jewels" of Hedgeye's intellectual property, being the product of Hedgeye's investment of many millions of dollars, as well as years of intensive work, troubleshooting, continuously improving and innovating, as well as working closely with its customers.  Hedgeye's models were developed

iteratively over time by teams of Hedgeye employees acting within the course and scope of their employment.

42.     Hedgeye's competitive marketplace consists of financial analysts analyzing the results of financial models.  Customers base their purchasing decisions on their perceptions of the resulting analysis.  For Hedgeye and its competition, the financial models are the very lifeblood of the business.  The secrecy of Hedgeye's financial models provides Hedgeye not just with competitive advantage, but irreplaceable, priceless value.

43.     Hedgeye also receives commercial advantage from the secrecy of its models because no other competitor employs the same proprietary methods and combinations of formulas, rendering Hedgeye's analysis unique (save Defendants).  For example, Hedgeye's core model employs uniquely curated and back-tested economic data points to which Hedgeye assigns varying weights.  No other competitor uses those same Hedgeye data points, or uses data points in the same way with the same weighting and re-weighting.  It took Hedgeye many years and significant investment of resources to evolve the financial models to where they are today.

44.     Hedgeye also gains competitive advantage by the very fact that its financial models are secret and no competitor (save Defendants) can claim to employ Hedgeye's methodology.

45.     Hedgeye gains a competitive advantage because its source models have a number of other features, and employ a number of other methodologies, that are proprietary to Hedgeye and represent changes and improvements to the traditional features and methodologies of competitors' models.

**Hedgeye's Customer Lists**

46.     Hedgeye has hundreds of institutional investor clients who pay significant amounts of money to subscribe to Hedgeye's research.  Hedgeye has thousands more retail investor subscribers to its one-to-many newsletter and webcast research.  Most or all of the institutional investors do not want third parties to know about their engagement with Hedgeye because they do not want customers to know what information they buy rather than create; Hedgeye's standard institutional service agreement offers such institutional subscribers a promise that Hedgeye will not disclose their identity.

47.     Hedgeye also has assembled various customer lists over a period of years, through the expenditure of substantial time and money including personal solicitation.  It would take years to develop the lists from scratch, if it were even possible.

48.     Hedgeye's customer lists are particularly valuable because they reflect Hedgeye's selection of customers constituting a specialized market; that is, key buy-side investment personnel, professional money managers, and registered investment advisors and sophisticated retail investors, who are interested in particular investment services such as dynamic investment models and daily podcasts, their interest level, and the amount they wish to pay for such research.

49.     Dale was responsible for sending out a weekly "Rise & Grind" e-mail to approximately 1,600 names.  That list was further curated to include only particular contacts who did a certain minimum amount of business with Hedgeye; in other words, the list was curated to contain contact information for what had proven to be Hedgeye's most engaged and lucrative subscribers, and had opted to receive higher level of engagement on Hedgeye's models.

14

50.   Hedgeye uses a third-party service called StreetContxt to manage some institutional client lists and to create more particularized lists to distribute specific content to only those clients.  Hedgeye also keeps a master list of contacts that Hedgeye developed only through the substantial investment of time, money and energy.  Assembling them took many hours of work over the course of many years at the cost of millions of dollars.  Given Hedgeye's business model of, in part, providing email content via paid subscriptions, the contacts are one of Hedgeye's most valuable assets.  The contacts are especially valuable because they reflect Hedgeye's current, paying clients with particularized interest in macroeconomic research data; *i.e.*, the most likely prospective paying customers for a competitor to target.

51.   Hedgeye's proprietary and confidential models, along with its customer lists, constitute Hedgeye's trade secrets.

**Hedgeye Notebooks**

52.   Hedgeye's CEO Keith McCullough developed through years of experience a method of creating and maintaining "notebooks" to document whether certain securities are trending bullish or bearish based on Hedgeye's proprietary market signals.  McCullough's proprietary method of note-taking constitutes Hedgeye trade secrets.  The notebooks also constitute and contain Hedgeye confidential information and trade secrets, as they contain a daily, systematic recording of carefully curated macroeconomic data regarding investable securities, commodities, currencies and indices.  This collection of economic data is annotated with Hedgeye's trade secret trend signals, notes regarding specific Hedgeye clients' interest therein; and the means for communicating the results of Hedgeye's trade secret economic analysis methodology.

53.     The entirety of these notebooks constitute Hedgeye's trade secrets.

**Hedgeye's Measures to Protect Its Confidentiality Information**

54.     All Hedgeye employees are required to sign agreements acknowledging that the information to which they would be exposed at Hedgeye is proprietary and confidential. Hedgeye employees are trained regarding the identification and treatment of confidential and proprietary company information, and employees are required to agree not to disclose such information to anyone outside Hedgeye at any time either during or after their employment.

55.     Hedgeye employees also are legally bound by Hedgeye's written Code of Ethics, which was distributed to all employees.  The Code of Ethics requires employees to acknowledge that they owe a "duty of loyalty to the Firm," and reaffirm that they "must only use Firm confidential information for authorized purposes."

56.     Each employee also is required to submit an annual "Year End Attestation" certifying his or her compliance with Hedgeye's Code of Ethics.

57.     Hedgeye's confidential information and trade secrets are disclosed on a "need-to-know" basis.  All confidential information and trade secrets is required to be stored only on the company network, and that network is password protected and requires a secure VPN login to access remotely.  Further, access to specific directories, folders and files is permission-based.

58.     Hedgeye is not aware of any prior breach of confidentiality concerning its proprietary and confidential information.  Hedgeye has no reason to believe that its confidential information and trade secrets could be disclosed other than intentionally.

59.     Hedgeye's most active and important trade secret models were controlled by a former Managing Director at Hedgeye, and no other employee had access to Hedgeye's most current versions of those models.  Those models generally were not shared internally or externally.  Even the client-facing output models were provided only under a limited license and could not be republished pursuant to Hedgeye's service agreement (for institutional clients), disclaimers and website Terms of Service (for retail or mass market subscribers).

**Nadine Terman and Solstein**

60.     Nadine Terman is a founder, CEO and CIO of Solstein, a San Francisco-based investment firm.  Terman founded Solstein in 2010, two years after Hedgeye was founded.

61.     Prior to founding Solstein, Terman was a professional investor focused on bottom-up company analysis.  Solstein first subscribed to Hedgeye Macro research from 2011 until late 2012.

62.     After a few years without a subscription to Hedgeye, Terman wrote to Hedgeye customer service in January 2016 inquiring about products and services.  For the first quarter of 2016, Terman negotiated with Hedgeye for an institutional-level subscription to Hedgeye, but ultimately advised Hedgeye that Solstein could not afford Hedgeye's services at that time.  However, in November 2106, Terman, through her personal email account, signed up for an annual subscription to Hedgeye's All-Access Pass, a bundle of various mass market macro research products designed and marketed to serious retail investors – not institutional investors.

63.     In 2017, Terman begin negotiating again with Hedgeye for an institutional-level subscription to Hedgeye Macro research for Solstein   Solstein came on as an institutional subscriber to Hedgeye's Macro research (as well as other sector-specific research) in July 2017.

64.    Over time, Terman and Solstein  deemed Hedgeye's macro research and process as indispensable to their business.  Terman communicated frequently with Hedgeye analysts (including McCullough, Dale and then-Hedgeye Macro analyst, Ben Ryan).  Terman's use of Hedgeye's research allowed her to market Solstein  as having a "top-down view that proactively transitions portfolios ahead of major macroeconomic environmental changes and employs quantitively trading signals as part of its investment framework."

65.     Solstein remained a subscriber to Hedgeye's institutional macro-economic research until April 1, 2021.  At times its subscription included both Macro and fundamental stock research; paying Hedgeye up to $140,000 per year.

66.    From 2014-2019, Ben Ryan worked closely with McCullough on Hedgeye's Macro research team.  Ryan rose to the rank of top macro market volatility signal analyst under McCullough.  Ryan worked with Terman while Solstein was a client of Hedgeye's.  In 2019, Terman and Solstein hired Ryan as their Vice President of Investments, even though Hedgeye and Solstein had agreed to a mutual non-solicitation clause in their negotiated service agreement.

67.    On information and belief, Terman and Solstein hired Mr. Ryan in an effort to obtain Hedgeye's trade secret process.  A short time after hiring Mr. Ryan, Terman and Solstein decreased their annual subscription fees with Hedgeye by 50%.

68.    Separate and apart from Hedgeye's business of subscription-based financial research, Hedgeye also has an extensive and expanding media presence through its "HedgeyeTV" platform.  Mass market subscribers tune into Hedgeye's website multiple times a day to consume various macro, stock-specific, and general financial market commentary and information.  Hedgeye hosts two daily shows, The Macro Show and The Call (around-the-horn

18

style market and stock commentary from every analyst).  On an average market day, Hedgeye may have anywhere from one to four additional live or recorded shows.

69.     CNBC primarily carries business day coverage of U.S. and international financial markets.  Hedgeye directly competes with companies like CNBC and Bloomberg for the attention of intelligent investors seeking accurate and predictive financial information.  For example, Hedgeye directly competes with CNBC for viewers and followers of CNBC's Fast Money and Jim Cramer programming.

70.     Beginning in early 2020, Terman became a key CNBC contributor, where it was not uncommon for her to use Hedgeye's recognizable jargon and nomenclature, parrot Hedgeye's market predictions and reference Hedgeye's research without credit given to Hedgeye.  In this way, Terman helped CNBC, Hedgeye's competitor, to benefit from Hedgeye's research.  Terman often would pass off Hedgeye's advice and process as her own.

71.     Unless expressly set forth otherwise, all actions and inactions of Terman alleged herein are attributable also to Solstein.

**Steven Lamar**

72.     Steven Lamar subscribed to a number of premium Hedgeye mass market products as a retail investor, in contrast to Solstein, for example, which was an institutional subscriber.

73.     On information and belief, upon learning that Hedgeye does not manage money, Lamar turned to Terman after seeing her in a Real Conversation (a long-form interview format for which Hedgeye and McCullough are well known in the marketplace) with McCullough, and

learning that Terman was an adamant follower of the Hedgeye process. Lamar then gave Solstein a significant portion of his family money to manage.

74.     On information and belief, Terman and Lamar discussed how they might collaborate and conspire with Dale to establish a competing business that would then develop trade signal tools and macro-economic research derived from Hedgeye's trade secrets and sell them to Terman and Solstein, and other Hedgeye clients, at a fraction of the cost.

75.     In March 2021, Terman introduced Dale and Lamar.

**Defendants' Agreement to Steal Hedgeye's Trade Secrets Begins**

76.     In March 2021, Terman contacted and spoke to Darius Dale, and agreed upon a plan by which Dale would steal Hedgeye's trade secrets, Lamar would finance and manage their launch of a competing business, and the competing business would sell to Terman and Solstein Capital virtually identical research that Solstein had been buying from Hedgeye, but at a fraction of the cost. Terman and Solstein would in turn market the Hedgeye process as their own.

77.     In so doing, Terman and Solstein would have both Ryan, responsible for running the signaling component of the Hedgeye macro process, and Dale, responsible for operating and having access to the quad-framework of the Hedgeye macro process. Through 42 Macro, Terman also would establish a new competitor to Hedgeye, further benefitting herself and Solstein. Terman has also continued to promote herself and Solstein on CNBC using the Hedgeye process implemented through 42 Macro, while aware that Hedgeye does not approve of her doing so without crediting Hedgeye.

78.    Defendants discussed with Dale his employment with Hedgeye.  On information and belief, both Terman and Lamar were aware of and discussed with Dale the fact that he had employment contracts with Hedgeye that prohibited him from competing with Hedgeye while still employed, as well as clear restrictions on Dale's right to disclose Hedgeye's confidential information and trade secrets both during and after his employment.

79.    Lamar and Terman each knew that, should Dale follow their advice, he would be breaching his agreements with Hedgeye and breaking the law.

80.    On information and belief, both Lamar and Terman discussed their plan whereby Dale would steal Hedgeye's trade secrets, run a competing business that Terman would help launch, and sell to Solstein the same research that Solstein had been buying from Hedgeye.

81.    Dale told Terman and Lamar, "You're going to be blown away by the granularity and soup-to-nuts asset allocation and portfolio construction solutions I'm going to provide. . . . No one at Hedgeye has any knowledge of these solutions because it's all in my head/notebook."

82.    On information and belief, both Lamar and Terman urged and encouraged Dale to terminate his employment with Hedgeye, promising him direct and indirect compensation for doing so.

83.    On information and belief, both Lamar and Terman also encouraged and assisted Dale in stealing Hedgeye confidential information and trade secrets, promising him direct and indirect compensation for doing so.

84.    On information and belief, until Dale and Terman had their conversations, Dale did not intend to compete directly with Hedgeye.  But for Defendants' encouragement, Dale

21

would not have breached his employment agreements.  Defendants' encouragement also was a substantial factor in Dale's decision to do so.

85.     For example, when Dale decided that he would resign from Hedgeye, he planned to leave only over a period of months, and he considered working for a client and/or opening his own fund to manage.  Hedgeye supported both endeavors and offered Dale severance while he pursued them.  However, on information and belief, Terman did not want Dale to open a fund that would compete with her own; rather, she encouraged him instead to become a service provider to her fund.  It was only after speaking with Terman, and with Lamar, and receiving their support and encouragement, that Dale began breaching his employment agreement with Hedgeye and preparing to launch a competing business.

86.     On March 24, 2021 – in consultation with Dale and Lamar – Terman requested a call for the afternoon of Monday, March 29 to downgrade Solstein's Hedgeye subscription. Terman knew at this time that Dale would resign on Sunday, March 28 and begin servicing Solstein with Hedgeye's misappropriated trade secrets immediately thereafter.

**Defendants Agree To Create A Competing Business and Dale Resigns**

87.     Hedgeye management was surprised and disappointed that, during his 2019 annual review, which took place in early 2020, Dale expressed his view that he was not adequately compensated.  In subsequent months, Dale's behavior changed.  He started to privately and publicly claim that he was "the inventor of the Quads," a construct used in Hedgeye's proprietary GIP model.  Dale increasingly declared that he had "built the firm" and increasingly began claiming he invented, and controls, the models that constitute Hedgeye's

intellectual property and trade secrets.  Simultaneously, Dale expressed increasing and more vocal complaints about his perceived inadequate compensation.

88.     Many at Hedgeye were disappointed with Dale's attitude.  They knew that Dale was a college senior, not part of the workforce, when Hedgeye was founded in 2008.  The Hedgeye process as envisioned by Keith McCullough and implemented in part through Hedgeye's GIP model, the cornerstone of the firm, had been fully developed by the time Dale was hired, 18 months later, as a junior analyst straight out of school without any work experience.  Many found it absurd and naïve that Dale would suddenly demand larger compensation and equity participation when he already had been so handsomely compensated for his contributions as a Hedgeye employee.  That Dale would make such demands by coupling them with specious claims Hedgeye's IP belonged to him only made the demands more inappropriate.

89.     These themes were addressed with Dale during his 2020 annual review, which took place on February 9, 2021.  At that meeting, Dale demanded increased compensation and a follow-on meeting took place on March 11, 2021.

90.     At the follow-on meeting, Dale was informed that his base salary, already one of the very highest at Hedgeye, would again increase and his bonus would be the highest bonus of any employee on the research team.  In fact, Dale's year-over-year bonus increase would significantly outpace the growth and profitability of the institutional macro business for which he was responsible.

91.     Dale's expletive-laden reaction to this offer was that he would be leaving Hedgeye.  In the ensuing weeks, while still employed at Hedgeye, Dale began a thoroughly

23

planned theft of Hedgeye's intellectual property.  Simultaneously, his interactions with Hedgeye became increasingly erratic and threatening.  In one instance he emailed Hedgeye's in-house counsel stating that would use his standing as "a very reliable source in the dead center of the … [Hedgeye] community" as "a loaded gun full of uncomfortable truths."

92.     On March 21, 2021, Hedgeye sent Dale a proposed separation agreement requesting Dale to acknowledge Hedgeye's trade secrets and confidential information, as well as non-solicitation and non-competition components.  Dale responded that he had concerns, and Hedgeye responded that it was open to discussion to assure Dale he could move forward with future plans he had discussed.

93.     The parties and their attorneys exchanged marked-up drafts of a settlement agreement, and Dale removed all portions related to acknowledging Hedgeye's intellectual property and trade secrets.  Unbeknownst to Hedgeye, Dale's negotiations were being orchestrated by Hedgeye subscribers Lamar and Terman / Solstein.

94.     On or about March 21, 2021, and over the next few days, each Defendant discussed with each other Defendant scheme in which Lamar would start a business venture that Dale would manage and that would directly compete with Hedgeye using Hedgeye's trade secrets.  Upon information and belief, until Defendants had these conversations, Dale did not intend to compete directly with Hedgeye.

95.     In fact, Terman was in constant contact with Dale, and actively coached him, as he negotiated his exit from Hedgeye and worked with Terman and Lamar on establishing the unlawful competing venture.  They named the competing venture "42 Macro."

96.     While Dale was still employed with Hedgeye, Terman gave him constant and extensive feedback and advice on how they would launch and promote 42 Macro on Twitter, LinkedIn, and by email.  Terman was intimately involved in establishing 42 Macro, including making decisions about pricing, graphics, its product names and offerings.

97.     On information and belief, Terman also financially supported the launch of 42 Macro and has an informal or formal ownership interest in the venture.  At a minimum, Terman and Solstein finance 42 Macro by paying guaranteed subscription fees.  Terman knew and intended that by supporting 42 Macro, she would damage Hedgeye.

98.     On information and belief, both Lamar and Terman knew that they were assisting Dale in breaching his employment agreements, in breaching his fiduciary duties and breaking the law.

99.     On March 24, 2021, while Dale was still employed with Hedgeye, Defendants through Lamar officially established 42 Macro by filing the "LLC Registration – Article of Organization" for 42 Macro with the California Secretary of State.

100.    On or about March 25, 2021, while Dale was still employed by Hedgeye, Dale updated his social media, including his LinkedIn profile, to say that he was a founder and CEO of 42 Macro LLC.

101.    Defendants intended that the same customers who had been paying Hedgeye for content they received from Hedgeye through Dale would shift their business from Hedgeye to 42 Macro if they knew they were getting research that was based on Hedgeye's models.  In other words, Hedgeye's customers were not just targets of Defendants; they were the prime targets.

102.   Terman did everything she could to maximize 42 Macro's success, to Hedgeye's detriment.  For example, Terman directed the timing and content of Defendants' social media messaging about Hedgeye and 42 Macro.  Among other things, Terman directed Dale to simultaneously update all his various social media at once and to have content ready to publish as soon as 42 Macro went public.

103.   When Terman directed that Defendants immediately start publishing content, Dale responded that there was a "problem with having content ready off the bat."  Dale told Terman that doing so implies that "the models I used to produce the analysis were created while working at Hedgeye and thus would be subject to their IP claims."

104.   On March 27, while Dale was still employed by Hedgeye, Terman discussed with Dale whether he would spend his remaining time "helping [Hedgeye] transition," or "spend the time working on 42 Macro."

105.   On March 28, 2021, with Defendants' knowledge, approval, encouragement and financing, Dale resigned from Hedgeye via email attaching his resignation letter.

106.   On March 31, 2021, Hedgeye again sought Dale's acknowledgment regarding Hedgeye intellectual property and trade secrets, but less broadly.  On April 1, 2021, Dale wrote to Hedgeye that after careful consideration he has chosen to "eschew Hedgeye's amended separation proposal."  He acknowledged that "specific algorithms" qualify for trade secret protection.  Shortly after that, Dale wrote again saying that "I will have a new counsel reach out to you soon."

107.    In April, Hedgeye continued to negotiate with Dale's new attorney.  Dale's new attorney indicated that a separation agreement must include that Hedgeye release all claims against Dale.  Hedgeye was not yet aware what claims it might release in such an arrangement and engaged KLDiscovery to undertake a forensic examination of Dale's activity on his work computer prior to leaving the company.

**Defendants Acquire, Disclose and Use Hedgeye's Confidential Information and Trade Secrets**

108.    In the days and weeks before he resigned from Hedgeye, Defendants discussed how they would build the models on which 42 Macro would be based.

109.    Defendants' actively worked together to build 42 Macro's models.  For example, while Dale was still employed with Hedgeye, Terman (with the assistance of Lamar) invited him to edit a folder on Dropbox that was named "42 Macro."  Terman wrote, "Here is a drop box with some examples."  On information and belief, Defendants invited Dale to breach his employment agreements.

110.    Defendants also knew that Hedgeye's models were intellectual property that was owned by Hedgeye not Dale.  Terman admitted to Dale, "[i]f you built something while at their company, technically they own it."

111.    Defendants discussed among themselves how they might get around what they deemed to be the "technicality" of Hedgeye owning its intellectual property; writing, for example, "I would just make sure your lawyer gives you advice."

112.    Hedgeye recovered Dale's company-issued laptop.  Many months after his departure from Hedgeye, however, and continuing to present, Dale remained in possession of notebooks containing extensive notes that had been instructed by Hedgeye to maintain while employed there.

113.    The forensic examination of Dale's Hedgeye-issued laptop by KLDiscovery makes clear that Defendants copied numerous files constituting Hedgeye's proprietary and confidential information and trade secrets.  Defendants undertook these actions to compete with Hedgeye using Hedgeye's trade secrets.

114.    Early Sunday morning on March 28, 2021, before Dale emailed his resignation, Defendants copied dozens of computer files comprising gigabytes of information from Dale's work computer to his private Dropbox account in the cloud.  Dale has admitted to this copying.

115.    The files that Defendants copied to Dale's Dropbox consisted of Hedgeye's most valuable confidential information and trade secrets, including its proprietary and highly confidential financial models and Excels files.

116.    For example, Defendants copied the files named, "Global Macro Risk Monitor.xlsx" "US INFLATION Model.xlsx," and "US GROWTH Model.xlsx."  Those files are highly confidential Hedgeye financial models and trade secrets.

117.    In fact, Defendants took one critical file that Hedgeye was only able to recover after the Court issued a temporary restraining order requiring Dale's compliance.  In other words, Defendants did not just "copy" that file, Defendants actually destroyed Hedgeye's only copy. The file, named "PRICE VOLUME VOLATILITY.xlsx," is a dynamic source model which took

years to develop, and which contains and constitutes Hedgeye's proprietary and confidential information and trade secrets.

118. The Price Volume Volatility document was saved locally on Dale's company-issued laptop. Dale accessed the Price Volume Volatility document on his company-issued laptop on March 24, 2021, at 4:10 p.m. Dale interacted with a file with the same name on his personal Dropbox account on March 24, 2021 at 6:19 p.m.

119. After Dale's resignation, Hedgeye learned that he had not complied with the company policy of saving critical documents, such as Price Volume Volatility document, to the network, rather than his desktop. When Dale returned his company issued laptop, the Price Volume Volatility document was missing from both the laptop and network, although Dale had last accessed it on March 24, 2021, and Hedgeye was unable to recover its most recent version.

120. On April 19, 2021, Hedgeye attempted to locate and access the missing Price Volume Volatility document. It was able to find three copies of auto-recovered versions of the file on Dale's laptop; however, the files were password-protected. This was strange because Hedgeye does not typically password protect individual files. Without the password, Hedgeye was unable to recover the Price Volume Volatility document. Moreover, the auto-recovered versions are many months old and may not represent the most current version of the Price Volume Volatility document.

121. Dale also took several screenshots of certain Excel spreadsheets saved on his company-issued laptop. Several are images of Hedgeye's trade secret source models.

29

122.    Defendants also accessed a personal Dropbox account in the days leading up to Dale's resignation, including the early morning of Sunday, March 28, 2021.  Dale did not have a company Dropbox account, and was not authorized to copy company files, much less the trade secret source models, into any Dropbox account.  Dale also cleared his Chrome web browser history the morning of Sunday, March 28, 2021, leaving only a trace of his Dropbox activity.

123.    Defendants set up Dale's Dropbox account to contain the same file and folder names as certain Hedgeye files and folders on Dale's company-issued laptop.  In other words, it is obvious that the files and folders Defendants interacted with through Dropbox were identical to those files and folders saved on Dale's company-issued laptop.  Those files are Hedgeye's proprietary and confidential information and trade secrets.

124.    Dale also used his personal cell phone to take pictures of his computer screen displaying highly confidential Hedgeye models and other information, which he has admitted to.

125.    After his extensive copying of Hedgeye confidential information and trade secrets to his personal Dropbox, Dale and Terman both shared access to a folder in Dropbox named "42 Macro."  Defendants thereby themselves directly acquired Hedgeye's confidential information and trade secrets.

126.    For example, on March 29, Dropbox notified Dale that "Nadine [Terman] made changes in your shared folders."  The document shows a partial file name of an Excel file that includes the words "Hedgeye" and "US_&_Global_GIP_Models".  The Dropbox notice also indicates that "Nadine added" that file to the 42 Macro shared folder on March 27, the day before Dale resigned from Hedgeye.

127.    Defendants' knew that Dale was not authorized to give access to Hedgeye's confidential information and trade secrets to anyone else.

128.    Defendants next copied Hedgeye's confidential information and trade secrets from Dale's Dropbox to his 42 Macro work computer.  Defendants then accessed and used these trade secrets while designing the files on which Defendants' business is based.

129.    Defendants examined Hedgeye's source files in painstaking detail, building financial models for use at 42 Macro with Hedgeye's proprietary and trade secret models open literally side-by-side with 42 Macro's.  Defendants' building of 42 Macro's source files was an iterative process; that is, Defendants consulted Hedgeye's source files, built some of 42 Macro's, double-checked Hedgeye's files, and further modified 42 Macro's files.  Dale has admitted in this litigation to using the stolen Hedgeye files in this way.

130.    Defendants closely examined Hedgeye's confidential information and trade secrets.  They did so with "extreme care," paying particular attention to "the more important aspects of the Hedgeye formulas," especially whenever they "got to a critical juncture in the development of 42 Macro's own formulas."

131.    Working with a common purpose and interest with Defendants, Defendants also copied specific formulas from Hedgeye's source files into their own source files.  Dale has admitted in this litigation to this copying.

**Defendants Hide And Destroy Evidence**

132.    After using Hedgeye's source files to create their own, Defendants knowingly and intentionally deleted Hedgeye's source files from Dale's personal/work computer so as to hide evidence of their misappropriation.

133.    Specifically, early Sunday morning before Dale tendered his resignation, Defendants tried to destroy the evidence of misappropriation by clearing Dale's web browser history and leaving only traces of his Dropbox activity.

134.    Terman advised and actively worked to destroy evidence of Defendants' misconduct prior to Dale's resignation, even offering Solstein's services to help conceal Dale's theft.  For example, she offered her technical team to "help you ensure Hedgeye cannot access anything from the [company] laptop you are returning."  She later emphasized, "I just did not want you to trust a Hedgeye IT person."  Dale took Terman up on her offer, asking Terman to "connect me with your tech people" because he was "cleaning" his Hedgeye laptop before returning it to Hedgeye.

135.    Similarly, after using Hedgeye's source files to create 42 Macro's source files, Dale knowingly and intentionally deleted Hedgeye's source files from his 42 Macro work computer so as to hide evidence of their misappropriation.  Dale has admitted to this destruction of evidence.  Upon information and belief, this was done with Defendants' active knowledge, approval and encouragement.

136.    On information and belief, Defendants also discussed the importance of communicating with personal email accounts like gmail instead of Dale's Hedgeye email.  As their plans progressed, Defendants determined to communicate by text, not even by gmail, so as to keep Hedgeye from learning of their misconduct.

32

**Defendants Continue to Conspire and Work Together**

137.   Defendants knew that the stolen Hedgeye information was deemed by Hedgeye to be critically important, proprietary and highly confidential and trade secret.  Defendants likewise viewed the Hedgeye information as highly confidential and trade secret.

138.   Dale discussed with Terman and Lamar how his work at Hedgeye constituted "designing valuable IP."  Defendants also discussed Dale's desire, should he leave 42 Macro, for "something that grants [him] permission to carry on using any such IP post any parting of ways."

139.   After Dale resigned, Hedgeye attempted to negotiate a separation agreement with him.  Hedgeye focused its efforts on obtaining Dale's acknowledgement as to Hedgeye's intellectual property.  Working with a common interest and purpose with each of the other Defendants, Dale resisted providing such assurances.

140.   Terman gave Dale extensive feedback and counseled him on how to manage his departure from Hedgeye so as to minimize suspicion, while simultaneously initiating negotiations with Hedgeye to reduce Solstein's subscription fees to Hedgeye.  When Hedgeye insisted that Dale agree to honor his obligations regarding Hedgeye intellectual property and confidential information, Dale forwarded for Defendants' review and comment the draft separation agreements he was negotiating with Hedgeye.

141.   On March 31, 2021, Hedgeye again sought Dale's acknowledgment regarding Hedgeye intellectual property and trade secrets.  Dale discussed Hedgeye's proposal with Terman and Lamar, who gave detailed advice on how Dale should negotiate with Hedgeye, ultimately strongly urging Dale to reject Hedgeye's amended separation proposal.  Dale did so,

even while acknowledging that Hedgeye's "specific algorithms" qualify for trade secret protection.

142.     Meanwhile, Terman and Lamar strategized with Dale as to how she would quash suspicion amongst the rank and file at Solstein.  Terman told Dale that she would explain to her team "the importance of [Hedgeye's] quad framework," and how she had Solstein "signed up for his new research service" so that "we'll continue to get his quad data once he sets up his frameworks in a few weeks."

143.     On information and belief, Defendants knew that 42 Macro would not only be competitive with Hedgeye because it was based on stolen Hedgeye trade secrets, and intended to offer identical services to the market, but also because Dale was intentionally sabotaging Hedgeye.  For example, Dale took one critical file that Hedgeye was able to recover only after a federal court issued a temporary restraining order requiring Dale to return it.  In other words, Dale did not just "copy" a particularly important file of Hedgeye's, he actually took Hedgeye's only copy.

144.     Before Dale resigned from Hedgeye, Defendants discussed with each other the competitive advantage that 42 Macro would have.  Dale told Terman and Lamar that "No one at Hedgeye has any knowledge of these solutions . . . .  At best, I'm leaving them with what will soon become an admittedly-popular-but-antiquated set of forecasting and backtesting tools. . . . At worst, I'm leaving them with tools they have no idea how to employ."

145.     Similarly, Dale told Terman and Lamar his view that in the week he resigned, Hedgeye had "been sending out the same file of stale model data all week. They don't actually have access to the nowcasts; they're on my hard drive."

34

146.    In response, Terman advised Dale that he would likely need to return to Hedgeye a "copy" of the financial models, presumably keeping a working copy for Defendants.

147.    Recognizing the likelihood of litigation should they be discovered, Dale continued explaining to Terman and Lamar that "[Hedgeye] will get the models back, but [with] only limited knowledge of how to use them . . . .  Oh well, his loss = our gain."

148.    Defendants worked with a common interest and purpose, and in concert and agreement with each other, with regard to each of the actions and omissions described above.

**Defendants Steal Hedgeye's Curated Customer Lists**

149.    Defendants also stole Hedgeye's highly confidential and trade secret customer lists.  Defendants copied confidential and trade secret files containing curated lists of the names of Hedgeye's highest paying clients at every level of the Macro business.

150.    As Dale was negotiating his exit from Hedgeye, he discussed with Terman and Lamar that he would broadly issue a public statement both explaining his departure from Hedgeye and plugging their new venture.  Defendants considered multiple versions, including one with a fabricated critical portrayal of his separation negotiations that Dale contemplated sending "if severance negotiations end poorly."

151.    Dale threatened Hedgeye that he would use his standing as "a very reliable source in the dead center of the … [Hedgeye] community" as "a loaded gun full of uncomfortable truths."

152.     In anticipation of carrying through on Dale's threats and sending the scathing email Dale discussed with Terman and Lamar, Defendants uploaded over 11,000 contacts from Hedgeye's master list of contacts into Dale's personal "My Contacts" list in Hedgeye's StreetContxt system.  To disguise their actions, Dale then copied all of the contacts to another personal folder, named for a local charity that Dale was known to be associated with, and which previously had only 65 contacts.  Defendants then exported the list to themselves from the folder named for Dale's charity.

**Defendants Steal Hedgeye's Confidential Notebooks**

153.     As per direction from Hedgeye CEO Keith McCullough, Dale was required to observe and copy McCullough's proprietary method of note-taking, and therefore Dale created and maintained Hedgeye notebooks regularly throughout the course of his employment with Hedgeye, and went through many composition notebooks over the years.

154.     While he was still working for Hedgeye, Dale used his personal cell phone to take pictures of Hedgeye's confidential information in the notebooks.  Dale took pictures, and emailed to his personal email address, confidential information contained in several different notebooks, including a notebook that Dale maintained in 2021.

155.     When Dale resigned from Hedgeye, Defendants misappropriated Hedgeye confidential information and trade secrets by failing to return several notebooks Dale had removed from Hedgeye.  Each Defendant actively participated in the misappropriation and discussed the notebooks amongst themselves in the context of strategizing whether and to what extent they should return Hedgeye intellectual property.

156.    Dale has admitted that he took a number of his Hedgeye notebooks and failed to return them even after the Court expressly ordered him to do so.

**Collin de Rham**

157.    In Spring 2021, Defendants decided that they would solicit and hire Hedgeye employee Collin de Rham to work for 42 Macro.  While still restricted from doing so by his Employment Agreement, Dale did in fact solicit Mr. de Rham.

158.    Around that same time, Mr. de Rham separated from Hedgeye and began working for 42 Macro.

**Longbow**

159.    In early 2021, Terman and Lamar agreed to a partnership that would compete with Hedgeye.  The name of the partnership was "Longbow," which Defendants would later announce was intended to offer a "a data driven, stock trading and risk management platform built to help investors make better informed and more profitable trading decisions."

160.    In March 2021, as Defendants agreed to misappropriate Hedgeye's trade secrets, they also agreed that Dale would join Longbow as a partner, that Longbow would become 42 Macro's customer, and that Defendants could further most effectively compete with Hedgeye by secretly operating Longbow in conjunction with 42 Macro.

161.    Terman and Lamar agreed to target Hedgeye's customers and discussed how they would drive significant traffic to Longbow in lieu of Hedgeye.

162.    Dale, for example, intended to retire a billionaire as a function of his contributions to Longbow.

163.    Since Defendants first conceived of 42 Macro, they intended that Longbow would play an important role.  Defendants repeatedly referred to "42 Macro" and "Longbow" together. The 42 Macro logo was prominently displayed on the Longbow website.

164.    On March 23, 2021, Lamar sent Dale a video describing the intended Longbow trading platform.

165.    Defendants discussed that when working for Hedgeye, Dale had been "designing valuable IP," yet Hedgeye deemed him "expendable."  Dale wanted to ensure that he had "permission to carry on using any such IP post any parting of ways . . . ."

166.    Each Defendant discussed with each other that Dale possessed Hedgeye intellectual property in his "head/notebook."  They also discussed Hedgeye's core financial models and opined that Longbow would hurt Hedgeye competitively.

167.    Keeping Hedgeye unaware of Longbow, and of its connection to 42 Macro, was critical to Defendants.  They agreed to communicate via text and to avoid mentioning Longbow even in their personal emails.

168.    Dale officially joined Terman and Lamar as a Longbow partner by April 4, 2021.

**Defendants' Unfair Competition**

169.    42 Macro's sole business consists of selling research based on the stolen Hedgeye confidential information and trade secrets financial models.

170.    Defendants worked closely together to micromanage the launch of 42 Macro to ensure it would have maximum impact on the market.

171.     On April 26, 2021, Defendants began publishing content based on models derived from Hedgeye's trade secret source models.

172.     Terman and Solstein obtain the fruits of the stolen Hedgeye information by "purchasing" it from 42 Macro.  In anticipation of receiving 42 Macro's research results, and even before Dale's departure was formally announced, Terman and Solstein discussed cancelling their institutional subscription with Hedgeye.

173.     Terman and Solstein get from 42 Macro what Dale claims is the same research that Hedgeye produces from its trade secret financial models.  For example, when asked, "What tools are you using to create your models," Dale responded, "The same one I've been using for the last 12 years," *i.e.*, the same ones Dale had been using at Hedgeye.

174.     Given the amount of time and effort required to develop the types of models that Defendants are employing, Defendants could not possibly have developed their models independently and without employing Hedgeye's proprietary and confidential information and trade secrets.  Defendants have publicly admitted that they "built [42 Macro's models] over 12 years," *i.e.*, while Dale was employed at Hedgeye.

**Defendants' Social Media**

175.     Dale created the Twitter account @42__Mgmt on March 22, 2021, while still employed as a Managing Director of Hedgeye.  His profile prematurely stated, "former managing director of Hedgeye."  Dale later renamed the Twitter account to @42macroDDale.

176.     In late March 2021, while still employed at Hedgeye, Dale updated his Twitter profile to "Founder and CEO of 42Macro."  He posted a Tweet that he was starting his own

research business the first business day after his resignation from Hedgeye.  He then posted "we're live! 42macro.com," and nearly immediately began posting charts, graphs, and commentary regarding his research (including Hedgeye materials).

177.    On March 25, 2021, Defendants first used LinkedIn to publicly-announce their two new companies, "42 Macro LLC" and "42  Management."  Defendants refer to 42 Macro LLC as an "online financial media company specializing in macro risk management;" Hedgeye sometimes refers to itself as "an independent investment research and online financial media company."

**42 Macro and Lamar Are Alter Egos**

178.    On March 24, 2021, Lamar filed the "LLC Registration – Article of Organization" for 42 Macro ("42 Macro LLC Registration") with the California Secretary of State.

179.    Upon information and belief, Lamar is the managing member of 42 Macro.  Upon information and belief, Lamar has made all material decisions regarding the creation and operation of 42 Macro.  Upon information and belief, Lamar is the "brains behind the operation [of 42 Macro]."

180.    Upon information and belief, Lamar came up with the idea of launching 42 Macro, created the business plan for 42 Macro, and determined that Dale should run 42 Macro. Upon information and belief, it was Lamar's idea that 42 Macro should compete directly with Hedgeye.

181.    Upon information and belief, 42 Macro has been ized exclusively by Lamar. Upon information and belief, no one except Lamar knows how much has been invested in 42 Macro.  Upon information and belief, Lamar alone controls the bank accounts for 42 Macro.

182.    Upon information and belief, Lamar makes payments on behalf of 42 Macro from his personal accounts.

183.    Upon information and belief, these payments include payments to Dale and/or his counsel to cover Dale's legal expenses.

184.    Upon information and belief, aside from Defendants, there are no other persons who own, are employed by, or have invested time or materials in 42 Macro.

185.    Because there is such unity of interest between 42 Macro and Lamar, 42 Macro should be disregarded as a business entity; Lamar and 42 Macro are functionally the alter egos of one another.

**All Defendants Acted Together**

186.    Each Defendant shared a common interest and purpose with each other Defendant; that is, all Defendants shared the common interest and purpose to misappropriate Hedgeye's trade secrets and confidential information.  Each Defendant worked in concert and agreement with each other Defendant to take the actions and omissions described above and misappropriate Hedgeye's trade secrets and confidential information.

187.    Each Defendant took individual, overt actions to misappropriate Hedgeye's trade secrets.  For example, Dale copied the trade secrets and used them to build competing financial

models.  Lamar established and funded 42 Macro to acquire and monetize the trade secrets and made all the material decisions regarding its creation and operation.

188.    By way of further example only, Terman assisted with business strategy and marketing, and agreed to continued financing through subscription purchases.

189.    As a direct and proximate result of Defendants' agreements, acts, and participation in their plan or purpose, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.

**Hedgeye's Harm and Defendants' Unjust Enrichment**

190.    Defendants have used, and have announced their intention to continue to use, Hedgeye's proprietary and confidential information and trade secrets in connection with their competing business.  For example, on April 23, 2021, Defendants sent a mass email from a 42 Macro email account.  In the email, Defendants disclosed a Hedgeye proprietary output model and presented financial analysis that is derived from Hedgeye's models.

191.    Defendants have used, and have announced their intention to continue to use, Hedgeye's proprietary and confidential information and trade secrets in connection with their competing business.  For example, on April 23, 2021, Defendants sent a mass email from a 42 Macro email account.  In the email, Defendants disclosed a Hedgeye proprietary output model and presented financial analysis that is derived from Hedgeye's models.

192.    Defendants also posted a screenshot of one of Hedgeye's weekly "Rise & Grind" e-mails from March 23, 2021.  Defendants did not have permission to share that e-mail with third

parties during Dale's employment at Hedgeye, and Defendants certainly did not have permission to use it to promote their competitive business.

193.    Multiple tweets by Defendants make clear that they are claiming as their own the proprietary models developed at Hedgeye.  For example, Defendants tweeted that Hedgeye's proprietary GIP model "is merely a conceptual framework," and that "[w]hat powers it are the forecasting and backtesting tools [Dale] built many years ago."  All of that, of course, was work made for hire and paid for by Hedgeye.

194.    When asked "What tools are you using to create your models," on April 16, 2021, Dale responded: "The same one I've been using for the last 12yrs: Microsoft Excel."

195.    Defendants have repeatedly falsely told Hedgeye's customers, and their own prospective customers, that Dale was the "brains" behind Hedgeye, and that "Firms don't produce research; analysts do."

196.    Customers instantly recognized that 42 Macro's products appear identical to Hedgeye's.  Customer have publicly asked, "Where can we see how your process will differentiate from Hedgeye?"  Defendants assure customers that 42 Macro provides the same research that Hedgeye provides:  "The easiest way to spot the differentiation is that . . . Dale no longer works at Hedgeye."  In other words, Defendants market 42 Macro's research by emphasizing to Hedgeye's customers that what they used to buy from Hedgeye, they now can buy from 42 Macro, and indeed only from 42 Macro.  Defendants tell Hedgeye's customers, "Firms don't produce research, research analysts produce research for firms," and "Firms don't produce research; analysts do."

197.     Other Hedgeye subscribers have asked why 42 Macro is using terminology that are "Hedgeye terms."  One customer reported that, "Some of us feel like children of divorce and are confused.  I love you (*i.e.,* Dale) and @KeithMcCullough," the CEO and co-founder of Hedgeye.

198.     Similarly, in response to a tweet which stated, "No one does a better job modeling the cycle than Hedgeye," Defendants respondedm "And the guy who built and maintained all those forecasting tools sweeps and mops the floors at @42macro now."

199.     Given the amount of time and effort required to develop the types of models that Defendants are now presenting on behalf of their new company, Defendants could not possibly have developed them independently and without employing Hedgeye's proprietary and confidential information and trade secrets.  In fact, Defendants admit on their Twitter account that Dale "built them over 12 years."  Dale quit Hedgeye earlier this year, rendering Dale's statement an admission that he created the models he uses at 42 Macro while still at Hedgeye.

200.     On April 23, 2021, Defendants linked to a proprietary Hedgeye document they copied, and posted on their new Twitter account, @42macroDDale: "Would you like to see forward-looking, actionable insights like these hit your inbox around 8am ET each weekday?  If so, please #subscribe when we go live Monday morning.  Thanks in advance for your support!" "Monday morning," in context, refers to Monday, April 26, 2021.

201.     When customers expressed admiration for Hedgeye's models, Defendants tried to dissuade them from doing business with Hedgeye, publicly stating "Just a reminder, however, the guy that built and maintained all of @hedgeye's macro regime #forecasting tools no longer works there."

202.    Through Defendants' efforts, Hedgeye has lost customers, including Solstein.  For example, some subscribers confirmed on Twitter their intent to switch from Hedgeye to 42 Macro.  One user responded to @42macroDDale: "Any hints on timeframe and pricing structure?  I want to plan which of my current subscriptions I am going to cancel to afford yours.  Huge fan!  Can't wait to see what you're cooking up."

203.    Another subscriber wrote: "I've read your posts . . . .  I came to the dance with @Hedgeye and I'll remain loyal to them as long as it works for me.  But, a 2nd opinion and view would be worth a look."  Dale responded: "Fair enough.  I take no offense to you or anyone else for remaining loyal to my [Dale's] old shop.  Just a reminder, however, the guy that built and maintained all of @hedgeye's macro regime #forecasting tools no longer works there.  I'm sure you recall the Cam Newton era in New England . . . ."

204.    Further, at least one current Hedgeye institutional client and one former Hedgeye institutional client and current mass market client, informed Hedgeye that Dale asked them to provide a testimonial and reference for 42 Macro.

205.    Defendants have made it abundantly clear that they think they are the owner of Hedgeye's proprietary and confidential information and trade secrets, and they intend to use that information to directly compete with Hedgeye by offering the identical services to the identical customers he serviced at Hedgeye.  At a minimum, hundreds of Hedgeye customers are certain to be confused.

206.    The financial impact of Defendants' unfair competition has been and will continue to be substantial.  In addition to the financial impact, Hedgeye is being irreparably harmed.  Multiple Hedgeye customers already have switched from Hedgeye to 42 Macro.  A

large but unknown number of customers would be Hedgeye customers, but they are not, because of Defendants' unfair competition.  Hedgeye also has been forced to expend substantial money, time, and other resources as a result of Defendants' misconduct.

**This Litigation**

207.    On April 26, 2021, Hedgeye initiated this lawsuit, alleging Dale's misappropriation of Hedgeye trade secrets, breach of his employment agreements and unfair competition.

208.    On information and belief, all Defendants have been and are aware of all the papers that have been filed, and orders that have been issued, in this litigation.

209.    Contemporaneously with filing its lawsuit, Hedgeye also sought a temporary restraining order ("TRO"), and submitted some of the substantial evidence it had uncovered. The Court issued a TRO the next day.  The TRO ordered Dale to return to Hedgeye material, specifically including financial models and notebooks.  It also ordered Dale to "preserve and forebear from accessing or in any way using any and all copies" of Hedgeye's files.

210.    Notwithstanding the Court's order, 42 Macro continued doing business as usual, publishing daily installments of research derived from the stolen Hedgeye models.

211.    Hedgeye moved the Court to stop 42 Macro from further publishing results derived from Hedgeye's models.  In response, Dale gave false sworn assurances that he had built 42 Macro's models "from scratch," and that after he copied Hedgeye's models to his Dropbox, he had not further accessed or disclosed them.

212.    On June 15, 2021, Dale testified under oath that he had earlier lied to the Court in his sworn statement.  Although he had said he only downloaded Hedgeye's files to his Dropbox, and had done nothing further, he now admitted that he actually further copied Hedgeye's files to the laptop he was using to build and run 42 Macro.

213.    Dale also admitted that, contrary to his earlier sworn statements to the Court, he actually had knowingly and deliberately studied the substance of Hedgeye's source models in detail while building 42 Macro's source models, with Hedgeye's proprietary models open literally side-by-side with 42 Macro's.

214.    Dale also admitted that, after using Hedgeye's models, he then intentionally deleted the Hedgeye files that he had copied onto his personal laptop that he used when constructing 42 Macro's source models.

215.    When Hedgeye alerted the Court that Dale had admitted earlier lying under oath, Dale insisted that although he had earlier lied, and destroyed evidence of his lies, he had only consulted Hedgeye's source files while building 42 Macro's, and he had never actually copied anything from Hedgeye's source files into 42 Macro's.  Dale and his attorneys repeatedly proclaimed to the Court, "It is one thing to view a source file, but quite another thing to draw upon and employ its content . . .  Dale was clear that he did not draw from any content included [in] those [Hedgeye] files . . .  Merely opening a file and reviewing its content is far removed from actually incorporating and using the same content in a rival product."

216.    But on August 27, 2021, Dale admitted that he had lied again.  For the first time, contrary to what he had repeatedly assured the Court, Dale admitted to "copying formulas"

directly from Hedgeye's models to 42 Macro's.  He also admitted to having copied partial lists of ticker symbols from Hedgeye's models into 42 Macro's.

217.   Though the Court entered the TRO on April 27, Dale and 42 Macro continued using the models with the Hedgeye formulas continuing into May.  Ultimately Dale admitted that sometime thereafter, he again violated the TRO by further accessing the files to intentionally delete "large numbers" of the previously copied Hedgeye formulas and ticker symbols, thereby attempting to further destroy evidence of their theft of Hedgeye's models.

218.   Dale also certified that, after the Court issued its TRO, he returned all Hedgeye models, and he later confirmed under oath on June 15 that he had returned all Hedgeye confidential information, specifically including its financial models and notebooks.

219.   Dale's certification to the Court, and sworn statements, were lies.  Dale had not, for example, returned the 2021 notebook.  When confronted, Dale suggested the notebook must have been lost, and that "these things go missing all the time."

220.   Five weeks later, however, Dale admitted that he had failed to return two additional Hedgeye notebooks, including the 2021 notebook.  Dale refused to provide any explanation as to why he had not produced them earlier when ordered by the Court.

221.   On August 20, 2021, Hedgeye filed an Amended Complaint adding Defendants 42 Macro and Lamar and on February 9, 2022, Hedgeye filed a separate complaint naming Terman and Solstein as Defendants.

222.   On August 27, 2021, after having repeatedly assured the Court under oath that he had diligently searched for and returned all Hedgeye files, Dale admitted that he had still been

lying.  Dale then produced to Hedgeye over 12,000 additional electronic documents, including over 5,000 files that hit on the keyword "Hedgeye," and 644 files with "Hedgeye" in the file name.  At least 30 files that Dale produced on August 27 were listed by name and were expressly ordered to be produced in the Court's April 27 TRO.  Defendants have never explained where the documents were found and why they were not produced earlier.

## FIRST CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)
### (Against all Defendants)

223.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

224.    Hedgeye's trade secrets include, as described above, its financial models in the form of Excel spreadsheets, its notebooks, and its customer lists.  All those trade secrets relate to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transcript in interstate commerce across the country and throughout the world.

225.    Hedgeye's trade secrets as described above thus constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

226.    Hedgeye's trade secrets derive both actual and potential economic value from not being generally known to Hedgeye's competitors, and from not being readily ascertainable through proper means by Hedgeye's competitors.

227.    Defendants downloaded Hedgeye's trade secrets by improper means, without Hedgeye's express or implied consent.

228.    Defendants knew or had reason to know at the time they accessed, downloaded, and/or used Hedgeye's trade secrets that they were acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

229.    At all relevant times, Hedgeye has taken reasonable measures to protect the secrecy of its trade secrets that Defendants have misappropriated, including those referred to above.

230.    Defendants' actions, as set forth above, constitute misappropriation within the meaning of 18 U.S.C. § 1839(5) because Defendants acquired Hedgeye's trade secrets through Dale, as described above.

231.    Defendants acquired the trade secrets through improper means and Defendants had reason to know, and did know, that they acquired the trade secrets through improper means.

232.    Defendants' actions also constitute misappropriation within the meaning of 18 U.S.C. § 1839(5) because Defendants disclosed Hedgeye's trade secrets as described above.

233.    Defendants' actions also constitute misappropriation within the meaning of 18 U.S.C. § 1839(5) because Defendants used Hedgeye's trade secrets as described above.

234.    Defendants disclosed and used Hedgeye's trade secrets without Hedgeye's express or implied consent.  Defendants knew they did not have Hedgeye's consent.

235.    Defendants knew that Dale had contractual, fiduciary and statutory duties prohibiting him from acquiring, disclosing or using the trade secrets.

236.     Defendants failed to return to Hedgeye the trade secrets that they misappropriated, retaining and using Hedgeye's trade secrets to compete with and/or otherwise harm Hedgeye.

237.     Defendants acquired, disclosed and used Hedgeye's trade secrets with the intention and effect of causing Hedgeye both economic and intangible harm.

238.     Defendants' misappropriation has proximately caused damages to Hedgeye, including but not limited to lost profits, goodwill, competitive advantage, and business opportunities.

239.     Defendants have been unjustly enriched as a further proximate result of their misappropriation of Hedgeye's trade secrets.  For example, Defendants were unjustly enriched because 42 Macro got an illegal "head start" by virtue of stealing Hedgeye's models.  Defendants were unjustly enriched, at a minimum, to the same extent that they made profits from purchasing 42 Macro's research based on stolen Hedgeye models.

240.     Defendants also have been unjustly enriched by receiving the benefit of Hedgeye's research process through misappropriation at no cost, or a fraction of the cost, that Hedgeye would charge Defendants for the research.

241.     Defendants' actions in misappropriating Hedgeye's trade secrets was intentional, willful, wanton, reckless and malicious and warrants exemplary damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C), and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

242.     Hedgeye also is entitled to preliminary and permanent injunctive relief to protect its confidential and trade secret information by prohibiting Defendants from (1) further

purchasing research based on stolen Hedgeye financial models, and (2) financing and otherwise assisting Dale, Lamar and 42 Macro with their ongoing misappropriation.

**SECOND CAUSE OF ACTION**
**(Common Law Misappropriation)**
**(Against all Defendants)**

243.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

244.    Hedgeye's trade secrets as described above constitute trade secrets within the meaning of the common law.

245.    Hedgeye's trade secrets that Defendants misappropriated derive economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Hedgeye's competitors, or to other persons or entities who might obtain economic value from their disclosure or use.

246.    At all relevant times, Hedgeye has taken the above-described reasonable measures to protect the secrecy of its trade secrets that Defendants have misappropriated.

247.    Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of the common law.

248.    Defendants' misappropriation has proximately caused damages to Hedgeye, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities.

249.    Defendants have been unjustly enriched as a further proximate result of his misappropriation of Hedgeye's trade secrets.

250.    Hedgeye's trade secrets are in continuous use in the operation of Hedgeye's business.

251.    Defendants misappropriated Hedgeye's trade secrets in breach of Dale's Employment Agreement and Hedgeye's Code of Ethics, and through improper means.

252.    Defendants' actions in misappropriating Hedgeye's trade secrets was willful, fraudulent, malicious, and was done with the intent to injure and oppress Hedgeye and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants.

253.    Hedgeye is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential and trade secret information by: returning Hedgeye's confidential and trade secret files, preserving and preventing Defendants from accessing or in any way using any copies of the files or any files derived therefrom, delivering to his counsel during the pendency of this action any files derived from the files, preserving all evidence, and not using or disclosing any trade secret or other confidential information obtained during his employment by Hedgeye.

### THIRD CAUSE OF ACTION
### (Breach of Contract)
### (Against Dale only)

254.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

255.    Hedgeye and Dale entered into a valid employment agreement supported by adequate consideration.

256.    Dale breached the confidentiality provision of the Employment Agreement.

257.    Dale breached the confidentiality provision of Hedgeye's internal Code of Ethics.

258.    Dale breached the non-solicitation provision of the Employment Agreement.

259.    Dale breached the non-competition provision of the Employment Agreement by preparing to compete and competing while he was still employed at Hedgeye.

260.    Dale breached the assignment of rights provision of the Employment Agreement.

261.    Hedgeye complied with and fulfilled its obligations under the employment agreement, including under the Employment Agreement and the Code of Ethics.

262.    The employment agreement is lawful and binding upon the parties.

263.    Dale has been unjustly enriched as a further proximate result of his breaches.

264.    As a direct and proximate result of Dale's breaches, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference with Contractual Relations)**
**(Against Lamar, 42 Macro, Terman and Solstein only)**

265.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

266.    Hedgeye and Dale entered into valid employment agreements supported by adequate consideration.

267.    Lamar, 42 Macro, Terman and Solstein had knowledge of the Employment Agreement.

268.    On information and belief, Lamar, 42 Macro, Terman and Solstein knew those employment contracts with Hedgeye prohibited Dale from competing with Hedgeye while still employed.

269.    Notwithstanding their knowledge of Dale's employment agreements, Lamar, 42 Macro, Terman and Solstein intentionally and successfully induced Dale to breach the confidentiality and intellectual property ownership provisions of the Employment Agreement, including by providing direct and indirect financial consideration.

270.    Lamar, 42 Macro, Terman and Solstein intentionally and successfully induced Dale to breach the confidentiality and intellectual property ownership provisions of Hedgeye's internal Code of Ethics.

271.    Lamar, 42 Macro, Terman and Solstein intentionally and successfully induced Dale to breach the non-competition provision of the Employment Agreement.

272.    Lamar, 42 Macro, Terman and Solstein intentionally and successfully induced Dale to breach the assignment of rights provision of the Employment Agreement.

273.    On information and belief, Lamar, 42 Macro, Terman and Solstein knew that Dale had agreed that anything he created during the course of his employment at Hedgeye,

specifically including financial models, were deemed "works made for hire" and belonged to Hedgeye, not Dale, notwithstanding his role in creating them.  Notwithstanding their knowledge of Dale's employment agreements, Lamar, 42 Macro, Terman and Solstein intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

274.    On information and belief, Lamar, 42 Macro, Terman and Solstein knew that Dale had agreed with Hedgeye not to disclose confidential information, "including without limitation, financial information . . . and proprietary investment and trading strategies of" Hedgeye during or after his employment with Hedgeye.  Notwithstanding their knowledge of Dale's employment agreements, Lamar, 42 Macro, Terman and Solstein intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

275.    On information and belief, Lamar, 42 Macro, Terman and Solstein knew that Dale had agreed with Hedgeye that, while employed, he would "not to engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company of its affiliates."  Notwithstanding their knowledge of Dale's employment agreements, Lamar, 42 Macro, Terman and Solstein intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

276.    On information and belief, Lamar, 42 Macro, Terman and Solstein knew that Dale had agreed not to "assist any other person or organization in competing (directly or indirectly) with the Company or any of its affiliates, or in preparing to engage in competition with the business or proposed business of the Company or any of its affiliates."  Notwithstanding their knowledge of Dale's employment agreements, Lamar, 42 Macro, Terman and Solstein

intentionally and successfully induced Dale to breach this agreement, including by providing direct and indirect financial consideration.

277.    As a direct and proximate result of Lamar, 42 Macro, Terman and Solstein 's intentional interference, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.

278.    Lamar, 42 Macro, Terman and Solstein's conduct was intentional, willful, wanton, reckless and malicious and warrants punitive damages.

## FIFTH CAUSE OF ACTION
### (Breach of Contract against Solstein only)

279.    Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

280.    Hedgeye and Solstein entered into a valid and enforceable contract ("Services Agreement") with Hedgeye, supported by adequate consideration.

281.    Pursuant to the Services Agreement, Solstein was prohibited from soliciting Hedgeye employees during the term of the Services Agreement, or from employing Hedgeye employees for twelve (12) months after the employee's termination.  On information and belief, Solstein breached this provision by soliciting Dale while he was still a Hedgeye employee.

282.    Pursuant to the Services Agreement, Solstein undertook a number of obligations with regard to Hedgeye's intellectual property.  For example, via incorporation by reference of Hedgeye's website Terms of Service, Solstein was prohibited from:

- Infringing on Hedgeye's intellectual property in using the Website or Services;

- Modifying or creating derivative works of the Services or Content or any part thereof;

- Doing anything that adversely affects the Website, the Services or the Company's business;

- Reverse engineering the Services or any Content available in connection with the Services; and

- Circumventing security measures.

283.   On information and belief, Solstein breached all of these prohibitions by misappropriating Hedgeye's confidential information and trade secrets as set forth above.

284.   Hedgeye fully performed under the Services Agreement, and/or its performance was excused.

285.   As a direct and proximate cause of Solstein's breach of the Services Agreement, Hedgeye was damaged and harmed by the loss of customers and profit, goodwill, competitive advantage, and business opportunities.

286.   As a direct and proximate cause of Solstein's breach of the Services Agreement, Defendants have been unjustly enriched.

**SIXTH CAUSE OF ACTION**
**(Interference With Contract against Terman only)**

287.   Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

288.   Hedgeye and Solstein entered into a valid and enforceable services contract ("Services Agreement").

58

289.     Terman was aware of the Services Agreement, and its terms.  Terman signed the Services Agreement on behalf of Solstein.

290.     Terman knew the Services Agreement prohibited Solstein from infringing on Hedgeye's intellectual property, soliciting its employees for twelve (12) months following the employee's termination and misappropriating Hedgeye's confidential information and trade secrets.

291.     Notwithstanding her knowledge of the Services Agreement, Terman caused Solstein to breach the agreement as set forth above.

292.     Hedgeye's process was critical to Terman and Solstein.  But for Dale and Lamar's assurance that she would receive the same analysis from 42 Macro, Terman and Solstein would not have cancelled Solstein's subscription with Hedgeye.

293.     As a direct and proximate result of Terman's intentional interference, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.

294.     Terman's conduct was intentional, willful, wanton, reckless and malicious and warrants punitive damages.

### SEVENTH CAUSE OF ACTION
### (Unfair Competition)
### (Against all Defendants)

295.     Plaintiff incorporates by reference the foregoing paragraphs above, as though fully set forth herein.

296.    By doing the things described above, Defendants have engaged in unfair competition by misappropriating the results of the labor, skill, and expenditures of Hedgeye.

297.    In misappropriating Hedgeye's trade secrets and confidential information, Defendants acted in bad faith, exploiting commercial advantage which belonged exclusively to Hedgeye.

298.    As a direct and proximate result of Defendants' intentional interference, Hedgeye has sustained and will sustain direct and indirect damages including special and consequential damages.  Defendants also have been unjustly enriched as a further proximate result of their unfair competition.

299.    Defendants' conduct was intentional, willful, wanton, reckless and malicious and warrants punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.    For an order directing Defendants to return to Hedgeye, and to refrain from further misappropriating, any of Hedgeye's proprietary, confidential or trade secret information;

2.    For an order directing Defendants to account for, and to pay over to Hedgeye, all gains, profits and advantages derived by Defendants from the above-described wrongful acts;

3.    For an Order prohibiting Defendants from (a) further purchasing research based on stolen Hedgeye financial models, (b) financing and otherwise assisting Dale, Lamar and 42 Macro with their ongoing misappropriation; and (c) further misappropriating any of Hedgeye's proprietary, confidential or trade secret information;

4.      For an order directing Defendants to account for, and to pay over to Hedgeye, all gains, profits and advantages derived by Defendants from the above-described wrongful acts;

5.      For an award of monetary damages sustained by Hedgeye as a result of Defendants' unlawful conduct, in an amount to be proved at trial;

4.      For an order multiplying or otherwise enhancing any award because of Defendants' willful and deliberate wrongdoing described herein;

5.      For an award of punitive damages resulting from Defendants' intentional, willful, wanton, reckless and malicious conduct, in an amount to be proved at trial;

6.      For an award of costs of this action and Hedgeye's reasonable attorneys' fees incurred herein by Hedgeye as authorized by law; and

7.      For an award of such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so-triable.


Dated: July 27, 2022                              /s/ Eric A. Prager_____

                                                  VENABLE LLP
                                                  Eric A. Prager
                                                  1270 Avenue of the Americas
                                                  New York, NY 10020
                                                  Tel.: 212-307-5500
                                                  Fax: 212-307-5598
                                                  eaprager@venable.com


                                                  Thomas E. Wallerstein
                                                  (admitted pro hac vice)
                                                  101 California Street, Suite 3800
                                                  San Francisco, CA 94111
                                                  Tel: 415-653-3750
                                                  Fax: 415-653-3755
                                                  twallerstein@venable.com

                                                  Attorneys for Hedgeye Risk Management, LLC