UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HEDGEYE RISK MANAGEMENT, LLC

    Plaintiff-Counterdefendants,

    v.

DARIUS DALE, STEVEN LAMAR, 42 MACRO LLC, NADINE TERMAN, and SOLSTEIN CAPITAL LLC

    Defendants-Counterclaimants

No. 21-cv-3687 (ALC) (RWL)

**ANSWER AND AMENDED COUNTERCLAIMS**

---

Defendants Nadine Terman ("Terman") and Solstein Capital, LLC ("Solstein") (together with Terman the "Counterclaimants") by their undersigned attorneys, hereby incorporate their answer and affirmative defenses to the third amended complaint of Plaintiff Hedgeye Risk Management, LLC ("Hedgeye" or "Plaintiff"), as filed on January 31, 2023, at ECF 461, and state their amended counterclaims as follows:

## NATURE OF THE COUNTERCLAIMS

1. These counterclaims arise from the illegal conduct of Plaintiff Hedgeye. As directed by its key principals, Keith McCullough ("McCullough") and Michael Blum ("Blum"), Hedgeye pursued a vindictive campaign of defamation and character assassination against Terman and her investment firm, Solstein.

2. Hedgeye made its false and defamatory statements with malice and with the intent of harming Terman and Solstein's business. Hedgeye successfully interfered in Solstein's and Terman's business relationships with clients and business partners, coupling its deceitful smears against Counterclaimants with direct and indirect threats of retaliation against others who would continue to do business with Solstein and Terman.

3. Hedgeye also brought baseless legal claims against Terman and Solstein that it knew lacked legal merit and that were based on factual allegations it knew were false.

4. Hedgeye brought these frivolous claims not because it sought legally available damages as relief – Hedgeye knows it suffered no losses cognizable in law – but instead to achieve illegitimate and collateral objectives. These objectives include gagging Terman's regular contributions on the popular CNBC investment news network, appearances that enraged McCullough, who bears a deep, longstanding animus against the network and its contributors. It also involved Hedgeye's exploitation of the filing of its initial legal complaint against Terman and Solstein in a desperate effort to bolster its settlement leverage in the failing lawsuit it had brought against co-defendants Darius Dale, 42 Macro, and Steven Lamar, asserting misappropriation of non-existent "trade secrets" that Hedgeye can neither coherently explain nor qualify after nearly two years of aggressive litigation and social media harassment.

5. Hedgeye then cynically exploited its shameless lies about Terman and Solstein to frighten and then poach Solstein clients, encouraging them to switch their money from Solstein to an investment advisor affiliated with Hedgeye and owned by McCullough.

6. Before Hedgeye turned its ire against Counterclaimants, Solstein had subscribed to Hedgeye's services, paying $420,000 from 2017-2021. However, Counterclaimants signed up for those services based on Hedgeye's false pretenses, false representations, and material omissions.

7. Among those false representations was the claim that Hedgeye did not need to register as an investment advisor with the SEC because it claimed to offer services akin to that of a passive newsletter, providing the same research in the same manner to all paying subscribers. In reality, Hedgeye aggressively peddles personal access to senior analysts who can provide bespoke

investment advice and services to a select clientele willing to pay premium prices for special treatment.

8. Most troubling, Hedgeye's "Real Time Alerts" ("RTAs") stock trading recommendations facilitated trading ahead of subscribers in the recommended securities. By the time Solstein and other subscribers received many of these RTAs, the recommended trading opportunity was gone, because of the unusual sharp price movements and trading volumes in the recommended securities that occurred in the preceding minutes of the RTA, outside of normal trading patterns.

9. Hedgeye's improper conduct has caused significant harm to Terman and Solstein. In addition to over $420,000 paid to Hedgeye for its services based on fraudulent inducement, Counterclaimants have suffered severe reputational harm, loss of business revenue in excess of $3.4 million and loss of business opportunities worth millions of dollars more.

## PARTIES

10. Terman is a resident of Palo Alto, California. She is a co-founder and a Managing Member of Solstein.

11. Solstein is a limited liability company registered in the state of Delaware. Its principal offices are located in California and its members are all citizens of California or Florida.

12. Hedgeye is a Delaware limited liability company with its principal place of business located at 1 High Ridge Park, Stamford, CT 06905. On information and belief, Hedgeye's members are citizens of the states of Connecticut, New York, and/or Nevada. On information and belief, Hedgeye's members are not citizens of California or Florida.

3

## JURSDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) because Counterclaimants are citizens of California and Florida, Plaintiff is a citizen of other states, and the amount in controversy exceeds $75,000.

14.     This Court also has subject matter jurisdiction under 28 U.S.C. §1367 because the counterclaims are sufficiently related to the claims in the action within original jurisdiction.

15.     This Court has personal jurisdiction over Plaintiff because Plaintiff consented to the jurisdiction of this Court by filing its own actions against Counterclaimants.

## FACTUAL ALLEGATIONS

### A.  Solstein's Business

16.     Solstein is an SEC-registered investment adviser that provides investment advisory services on a discretionary basis to a private fund and separately managed clients, such as high net worth individuals, family offices, and institutions.

17.     Solstein was founded as an independent investment firm in 2010. Its co-founders and current Managing Members are Terman, J.C. Torres, and Sandra Southworth. Collectively, they have over 70 years of investment experience. In 2011, they launched the firm's first investment vehicle.

18.     Solstein sources the majority of its investment ideas and themes through the views, perspectives and experiences of its Managing Members. Starting with only $5 million dollars in Assets Under Management ("AUM") in August 2011, Solstein over the next decade worked hard to grow the firm, which now manages hundreds of millions of dollars for its clients.

19.     Solstein and its principals have been leaders supporting diversity initiatives in the industry, launching the conference that has become 100WF's Global FundWomen Week,

4

spearheading Bloomberg's Diversity Drives Returns events, participating in Bloomberg's New Voices program, and participating in CNBC's NEXT program. Terman has served as keynote speaker for Bloomberg's annual diversity conference.

20.    In 2019, Terman began appearing on Bloomberg and CNBC (after participating in their New Voices and NEXT programs, which seek to train and increate diverse participation across their media platforms.) Terman and Solstein have been consistently committed to furthering diversity in the investment industry and encouraging participation and leadership roles from professionals with diverse backgrounds.

21.    Beginning in February 2021, Terman became a regular paid contributor on the CNBC show "Fast Money," an hour-long program airing each weekday in the key 5PM - 6PM Eastern time slot, covering key market events of the day. Terman typically appeared on Fast Money once or twice per week. She also made occasional appearances on other CNBC shows, including Closing Bell and Options Action.

22.    Terman's CNBC appearances were a key driver of brand awareness for Solstein and for her personally. They gave her and Solstein exposure to hundreds of thousands of viewers that they would not otherwise have had access to, and because the CNBC media properties have global reach and post clips to globally-available social media, it gave them access to people from all over the world.

23.    The CNBC relationship also led to invitations to other industry events and opportunities, further expending Solstein's reach.

**B. Solstein Was Fraudulently Induced Into Subscribing to Hedgeye**

24.    For compensation, Hedgeye provides investment advice to others and issues reports and analyses regarding securities.

25.     In 2017, Solstein entered into a services agreement with Hedgeye (the "Agreement").

26.     The Agreement required Hedgeye to deliver Solstein a copy of Hedgeye's Form ADV before execution.

27.     The Hedgeye Form ADV contained numerous material representations by Hedgeye, including representations that Hedgeye was complying with all applicable regulatory requirements and that it had disclosed all material conflicts of interest. Those representations were incorporated in the Agreement, under which Solstein acknowledged receipt of Hedgeye's Form ADV before execution.

28.     In executing the Agreement, Counterclaimants relied upon the truth and accuracy of the representations contained in the Hedgeye Form ADV.

29.     For one example, as a registered investment advisor, it was important to Counterclaimants that suppliers of research services such as Hedgeye were themselves properly registered and in compliance with their regulatory requirements. Counterclaimants would not have executed the Agreement and done business with Hedgeye had they known that Hedgeye was not in proper regulatory compliance.

30.     As another example, it was also important to Counterclaimants that suppliers of research services such as Hedgeye properly disclose any conflicts of interest.

31.     Hedgeye trumpets its "philosophy" as being contrary to the "conflicts of interest, unaccountability and opaqueness" that it characterizes as "the worst in Wall Street." Hedgeye advertises its own "founding principles" of "transparency, accountability and trust." Those claims were reinforced by Hedgeye's Form ADVs, which did not disclose the existence of any conflicts of interest.

32.     Hedgeye's representations about their supposed lack of conflicts of interest were significant and material to Counterclaimants, because they relied on the research and information they received from Hedgeye to be based on independent and honest views of the market and traded securities, unaffected by undisclosed financial interests and activities of Hedgeye itself, its officers, its agents, and its other business partners.

33.     Hedgeye's services to Solstein were renewed by Solstein every quarter.

34.     Each calendar year Solstein received additional Hedgeye Form ADVs (the "ADVs"), as filed each year by Hedgeye and required to be distributed to its clients. Nadine Terman at Solstein reviewed each of these ADVs and relied on the disclosures contained in them.

35.     Unfortunately, Hedgeye's ADVs contained materially false representations and key omissions about Hedgeye and its regulatory compliance. They also mispresented and failed to disclose blatant conflicts of interest between Hedgeye and its affiliates on the one hand, and subscribers such as Solstein on the other.

36.     Had the initial Hedgeye ADV provided to Solstein in 2017 accurately and properly disclosed the truth, including Hedgeye's failure to properly comply with federal and state registration requirements, and Hedgeye's conflicts of interest, Counterclaimants would not have agreed to execute the Agreement and purchase Hedgeye services.

37.     In addition, had any of the Form ADVs that Hedgeye provided to Solstein in subsequent calendar years from 2018 through 2020, accurately and properly disclosed the truth, including Hedgeye's failure to properly comply with federal and state registration requirements, and Hedgeye's conflicts of interest, Counterclaimants would not have agreed to renew the Agreement and continue purchasing Hedgeye services.

7

38.     Form ADV requires disclosure of conflicts of interest and Hedgeye's ADVs failed to disclose critical and material conflicts of interest. They also contained affirmative misrepresentations of these conflicts.

39.     Hedgeye's most egregious conduct is its advance facilitation of trading in the securities it recommends, a practice that allows for lucrative financial benefits for Hedgeye insiders, affiliates, business partners, and/or select clients, but renders many of those alerts effectively useless and potentially damaging for other "non-insider" subscribers.

40.     Hedgeye tells its subscribers that its RTAs are "an indispensable trading tool" that "takes our research team's basket of top long and short ideas and helps you risk manage them like a portfolio manager." A key selling point is that the RTAs are supposed to identify the best trading opportunities ("the juiciest stock and ETF ideas") in real time. The RTA discloses a recommended security, a trade recommendation such as a buy or a sell, a recommended price, and a time stamp.

41.     In many instances, however, by the time a Hedgeye subscriber receives the RTA, the proposed trading price is no longer available.  Instead of receiving the proposed trading price, a Hedgeye subscriber often receives a less favorable price, while others trading ahead of that subscriber receive the superior price.

42.     Each RTA bears a time stamp. However, there is a delay of several minutes between the RTA time stamp and the receipt of that alert in the inbox of a Hedgeye subscriber. As a result of that delay, many trade alerts recommended by Hedgeye to its paying subscribers could not be executed by the subscribers on the terms indicated in the alert because of intervening price movements against the subscriber.

43.     In many cases, the intervening price movements and trading volumes are extreme and far out of proportion with normal trading patterns for the security.

44.    By way of example, on September 7, 2022, at 12:25 PM, Hedgeye issued an RTA recommending the sale of security Krispy Kreme ("DNUT") at $12.16. The typical subscriber would receive that RTA several minutes later, no later than 12:27 PM.  However, by the time, the subscriber received the RTA, the selling opportunity had been lost, with the price having already plunged from $12.16 to $11.95.



45.    In addition to the unexplained sharp price movements, the affected securities also may experience unusually high trading volume spikes in the minutes after an RTA was stamped but before it was received by most subscribers.  For example, immediately after Hedgeye stamped the DNUT alert, trading volume increased from a few thousand shares per minute to over 120,000 shares. Approximately 180,000 DNUT shares had traded between the time Hedgeye stamped the RTA and certain subscribers received notice in their email boxes.

46.     Although the DNUT example is a single RTA from a single day, it represents a common and typical pattern going back many years, including the period when Counterclaimants were subscribers. Review of historical RTAs indicates that it occurs for many Hedgeye alerts, resulting in price and volume charts with similar spikes and volumes.

47.     Counterclaimants were among the subscribers that were victimized by this practice. Counterclaimants often timed trades in securities in which they were interested based on their receipt of an RTA from Hedgeye.  In the over 500 instances in which they did so during 2020 and 2021, they often received a price materially worse than the proposed trading price, because others had traded ahead of them.  Over 70% of the time during this period, Counterclaimants received a worse price, and around half of the time, Counterclaimants received a materially worse price. The average loss from the change in price in the materially worse instances was worse than negative 1.5 percent.

48.     Hedgeye was aware that many paying subscribers were not receiving real-time alerts in sufficient time to take advantage of the price disclosed in the alert and were being disadvantaged in relation to others also trading on that same alert.

49.     On or about February 22, 2021, Hedgeye added a new "product disclaimer" to its website relating to RTAs (the "RTA Notice").

50.     The information contained in the RTA Notice was never provided to Counterclaimants, and Counterclaimants were never informed that the language in the RTA Notice had been added to a webpage buried in the Hedgeye website. Nor were Counterclaimants informed of the availability of "third-party applications" used to transmit RTAs.

51.     Parts of the RTA Notice contradicts Hedgeye's own marketing of its RTAs. For example, the RTA Notice purports to caution investors that RTAs are not "an investment advisory

service" and that they merely provide "*hypothetical* quantitative pricing signals *in a virtual setting* to illustrate how an investor *might* employ certain Hedgeye investment ideas." (emphasis added). This hypothetical and conditional language is not found in Hedgeye's description of RTAs on the main customer-facing part of its website, which describes them as: "buy, sell, short or cover stock and ETF signals sent to you directly by Hedgeye CEO Keith McCullough. . . hand-selected from among the best qualitative ideas of our 40+ bottom-up Equity research analyst team."  Far from disclaiming that RTAs provide investment advice and constitute merely hypothetical signals in a virtual setting, Hedgeye represents that they "**HELP INVESTORS RISK MANAGE THEIR CORE INVESTING IDEAS—AND EFFECTIVELY TIME THEIR TRADES.**" (emphasis in original).

52.    Elsewhere in the RTA Notice, Hedgeye admits to knowing that some subscribers are disadvantaged and can be exploited by other subscribers who enjoy a timing advantage in trading RTAs. Hedgeye admits that "[s]ubscribers may experience delays between the time an Alert is issued on the Product Website and when the subscriber receives the Email Notification or App Notification ("Latency Periods")." It further admits that "Latency Periods may exceed several minutes and Latency Periods may differ across Third-Party Platforms or as between Email Notifications and App Notifications."

53.    At the time the RTA Notice was added to website in late February 2021, Counterclaimants had already paid for Hedgeye services for the first quarter of 2021. Hedgeye terminated all services to Counterclaimants, effective April 1, 2021.

54.    In any event, although the RTA Notice acknowledged that subscribers could be victimized because of long "Latency Periods," it misled subscribers in failing to disclose other serious problems with RTAs.

55.     Notably, as the DNUT example indicates, trading on RTAs may commence nearly instantaneously after the time stamp of the alert.  Given the time it takes to read and then enter a trade based on an alert, such trading would not be possible for ordinary subscribers regardless of how they receive the alerts (through email notifications, the "App Notifications," or directly through the Hedgeye website) and regardless of how short their "Latency Period" may be. Such trading could only occur if certain insiders or selected subscribers were tipped off in advance or if Hedgeye facilitated such insiders or selected subscribers in using automated trading and technical tools designed to allow rapid processing and trading on RTAs.

56.     Other clients have commented on the practice. On February 12, 2022, @fenderjazz77 wrote on Twitter "The timestamp for RTA's uploaded to their site lag the move on the stock. EVERY TIME. Especially obvious on thinly traded stocks. Creating bagholders out of paid subscribers.  I can't think of a more egregious example of front-running."  On the same day, @JohnGudritz wrote "By the time lowly subscribers got the trade, the institutions had moved the stocks.  Also, have you noticed that when KM sells 'some' at the top of the range, he will say he sold all of it if the stocks falls hard."  On March 2, 2021 @atiwary wrote "Someone is front running us… (emoji with questioning face) I see the same thing…never get the price quoted on the email alert on RTA in fact in 100% of the cases the price has moved away and I haven't take the trade"

57.     Responding to @norkot2003 on October 19, 2021 questioning whether Hedgeye runs their trades on RTA stocks before posting alerts, Michael Blum wrote "You are wrong. Hedgeye doesn't manage any money and employees are not allowed to trade any equities in the potential coverage universe."  That statement was false. Blum knew that employees could trade

exchange traded funds ("ETFs") and that some RTAs recommended ETFs that could be traded by Hedgeye employees.

58.    Hedgeye actively markets its RTAs. For many years, including the period when Counterclaimants were subscribers, Hedgeye would often publish a subset of performance data for its RTA. However, the performance data disclosed by Hedgeye was highly selective and presented in a manner that was misleading to Counterclaimants, to other Hedgeye clients, and to potential Hedgeye clients.  The disclosed performance data uses cherry-picked time frames and often fails to include all relevant historical data and disclosures.

59.    Hedgeye has set up the RTAs in such a way as to provide motive, means and opportunity to facilitate trading ahead of ordinary subscribers.

60.    On information and belief, Hedgeye insiders, affiliates, business partners or select clients avail themselves of the trading opportunity before other subscribers can take advantage of the RTA. For example, Hedgeye employees submit investment ideas to automated platforms designed to transmit these key investment ideas to selected institutions. Hedgeye's internal compliance did not actively screen the submissions, and such automated platforms could facilitate the ability of the recipients to trade ahead of ordinary subscribers on RTAs.

61.    On information and belief, one of the beneficiaries of this advantaged trading is Sierpinski Capital Management, LP ("Sierpinski"). Sierpinski and Hedgeye are under the common ownership and control of McCullough, Hedgeye's CEO. After Sierpinski's former CIO left the firm in the fall of 2021, McCullough was the only named investment professional on Sierpinski's ADV in Sections A and B for a period of time, suggesting he was the de facto CIO of Sierpinski. Blum is the President of both entities, meaning that both are under common operational direction.

13

Hedgeye has repeatedly marketed Sierpinski to subscribers and in a few cases, to its own employees.

62.     Compounding the conflicts of interest, Sierpinski was not directed to avoid trading in Hedgeye recommended securities. To the contrary, Sierpinski trades exclusively in securities recommended by Hedgeye.

63.     McCullough spoke with Sierpinski on a daily basis about his investment ideas, an extraordinary degree of access far more favorable than that provided to any Hedgeye subscriber. Many of these contacts involved regular phone conversations that could cover any subject matter, with no monitoring or oversight from Hedgeye compliance.

64.     Hedgeye did not disclose its troubling relationships with Sierpinski until it filed its 2021 ADV on March 31, 2021, the day before it terminated its relationship with Counterclaimants. Yet the Sierpinski Capital Onshore Fund LP reported a track record beginning in January 2020, and the Sierpinski Tactical Growth Strategy offered by NorthCoast Asset Management had performance dating back to September 2020.  Even after making the disclosures in the 2021 ADV, Hedgeye still failed to disclose that Sierpinski trades exclusively on securities recommended by Hedgeye and had regular communications with McCullough without oversight or control from Hedgeye compliance.

65.     Thus, although Hedgeye prominently markets itself as an "independent" provider of investment research, and contrasts itself with other Wall Street institutions that have proprietary trading arms, McCullough's and Blum's interests in Sierpinski put the lie to that claim. In particular, McCullough, who is also solely responsible for developing Hedgeye's trading ranges and RTAs, has a direct financial interest in the success of Sierpinski's trading portfolio.

14

66.     On information and belief, these failures recently triggered an investigation by the SEC into Sierpinski.

67.     On information and belief, another beneficiary of advantaged trading in RTAs is McCullough, either through his ownership in Sierpinski, or through his personal investments in what he refers to as the "McCullough Family Office" or "MOFO" or "PA".

68.     In 2021, Hedgeye made changes in its Code of Ethics governing employee trading practices, apparently in response to problems with controlling improper employee trading, raising the question of whether the extreme and irregular trading patterns around its recommended securities contributed to the change.

69.     Hedgeye's undisclosed conflicts of interest and facilitation of trading ahead of subscribers significantly compromised the value and usefulness of their services, and had Solstein known the true facts, it would not have executed the Agreement and it would not have continued to purchase services from Hedgeye through 2021.  Moreover, Solstein's clients may have been harmed by these conflicts of interest and unethical practices.

70.     The ADVs also contained material misstatements and omissions concerning Hedgeye's compliance with state and federal securities regulations.

71.     Notable among these compliance shortfalls is Hedgeye's failure to register with required state or federal securities regulators. Hedgeye is only registered as an investment adviser in one state, Connecticut.  Because Hedgeye has numerous clients in many other states, it should have registered either with the SEC or individually with all states that have state registration requirements for investment advisors with customer thresholds in the state. Hedgeye has not done so.

72.     Hedgeye claims in its ADVs not be subject to registration under the Advisers Act of 1940 on the ground that it is solely engaged in research and "[p]ublication of periodicals or newsletters." However, in 2021, Counterclaimants learned that Hedgeye was not entitled to this "newsletter" exception.

73.     First, Hedgeye's work for, communications with, and marketing of Sierpinski is inconsistent with the newsletter exception. Sierpinski's ADV filing demonstrates that its portfolio construction, research effort, and investment process is based on Hedgeye products and services and Hedgeye principals historically have marketed Sierpinski to its media viewers.  McCullough also spoke regularly with Sierpinski without oversight from Hedgeye.

74.     Second, Hedgeye is not simply providing a newsletter-like service to its subscribers.  It advises on preferred position sizes for specific securities, without regard to individual financial situation and risk tolerances. It also provides specifically timed buy and sell recommendations through its RTAs.

75.     Third, Hedgeye aggressively markets one-on-one access to senior research analysts and senior management of Hedgeye to institutional subscribers willing to pay premium prices for such access. These contacts are often made by telephone and Hedgeye makes no effort to monitor or control the content of such discussions, which can involve matters outside the scope of Hedgeye's published research.

76.     In short, Hedgeye is not a provider of a standardized one-to-many information service providing the same research in the same way to all subscribers on a consistent basis, as the newsletter exception would require. Instead, it provides different kinds of information to different subscribers, and operates a business model based on exploiting premium pricing in return for providing customized investment advice to a select clientele. Hedgeye's offerings also are not

16

impersonal and they are not of general and regular circulation, as the newsletter exemption would require. And Hedgeye's recommendations are not disinterested, given its conflicts of interest and affiliation with Sierpinski and internal trading by employees.

77. By falsely claiming entitlement to the newsletter exception, Hedgeye is able to circumvent marketing and communications rules it otherwise would have to follow.

78. Hedgeye's ADVs have historically misrepresented other material facts, including, among others, falsely representing that it did not recommend position sizes from 2017-2021, when in fact it was doing so, and falsely representing that its fundamental analysis was not designed to generate specific security Buy and Sell recommendations, when in fact it was doing so. Also, Hedgeye falsely represented that it did not provide investment performance, when in fact it was doing so.

79. Hedgeye knew that its ADVs contained material misstatements of facts and deliberately omitted to disclose material facts to Counterclaimants and other subscribers that were necessary to make Hedgeye's other statements not misleading. In particular, from at least 2017 through 2021, Hedgeye knew: (a) that it was improperly evading regulatory requirements to register as an investment advisor; (b) that it was not entitled to claim the "newsletter" exemption to registration; (c) that it was recommending position sizes; (d) that its fundamental analysis was designed to generate specific security buy and sell recommendations; and (e) that its design and implementation of real-time alerts facilitated trading ahead of less favored subscribers.

80. In addition, from approximately 2019 through March 31, 2021, Hedgeye knew (but did not disclose) that its relationships with Sierpinski gave rise to serious and material conflicts of interest. Even after March 31, 2021, Hedgeye knew that its ADVs still failed to disclose key

conflicts of interest concerning Sierpinski, including that fact that Sierpinski trades exclusively on securities selected by Hedgeye.

81. Hedgeye also deliberately omitted and misstated other material facts to Counterclaimants and other subscribers that were necessary to make Hedgeye's other statements not misleading. By claiming that Hedgeye does not manage assets, advise a private fund, or buy or sell securities that it recommends to advisory clients, Hedgeye was able to escape regulatory requirements and reviews covering marketing, soliciting clients, performance attribution, employee trades, and other key functions. Instead, Hedgeye principals had ownership and control of Sierpinski, and provided them regular advice on security selection.

82. Had Hedgeye disclosed the truth and had Solstein known the true facts about Hedgeye's misconduct and conflicts of interest, it would not have executed the Agreement and it would not have continued to purchase services from Hedgeye through 2021.

## C. Hedgeye's Turns Hostile Towards Terman and Solstein Because of Terman's Involvement with CNBC

83. Prior to Terman's appearances on CNBC, Hedgeye and its principals viewed her positively. Hedgeye personnel often praised Terman and expressed appreciation for her support of Hedgeye. They even hosted interviews with her on their Hedgeye TV platform and spoke at conferences she helped to organize.

84. In early 2020, shortly after the COVID outbreak, Counterclaimants reduced the level of their Hedgeye subscription as a cost cutting measure. That step did not lead to any deterioration in the Hedgeye relationship, which remained positive.

85. However, Hedgeye's attitude towards Terman changed radically when she disclosed in early 2021 that she has been hired by CNBC to make regular appearances on its flagship Fast Money program.

86.    McCullough had made appearances on CNBC programs as well as other media outlets, but he and the firm increasingly adopted a tone of paranoid hostility towards mainstream financial news sources, with particular animus towards CNBC.  For example, on March 3, 2022, Daryl Jones of Hedgeye tweeted (and Blum Retweeted): "CNBC CNN FOX News Bloomberg Real Vision Business Insider Zero Hedge All news organizations that have blackballed @Hedgeye…yet we still get bigger and stronger."

87.    Since cutting ties with CNBC, McCullough has consistently and regularly denigrated the network, peppering Hedgeye company communications with extremely insulting attacks against CNBC and its programs.  By way of example, these includes statements by that "CNBC Pumped B.S. Into Your Head For Decades; Time To Dump It," that CNBC shows are akin to a "circus" or a "zoo," and that on-air CNBC talent are "donkeys" or "monkeys."

88.    McCullough and Hedgeye's animus towards CNBC is motivated at least in part by their belief that Hedgeye competes with the network. Hedgeye's offerings include daily video shows sent to subscribers under the branding "Hedgeye TV", containing market analysis, research, and opportunities for Q&A with McCullough. Hedgeye views these offerings as competing with CNBC, to the point that in a January 19, 2022 press release, Hedgeye announced that: "If CNBC is the 'Blockbuster [Video] of Wall Street, we're Netflix."

89.    McCullough's appearances on Hedgeye TV regularly contain attacks on and denigrating references to CNBC and its employees and contributors.

90.    McCullough is obsessed with CNBC and its contributors, even though he denigrates them publicly.  He regularly listens to CNBC during his drive to work, which he discusses on Hedgeye media platforms.  Hedgeye also has a large TV screen above the employee workforce that regularly plays CNBC all day long, which often can be seen during its live shows.

91.     Upon learning of that Terman would be a regular contributor on CNBC's Fast Money, Hedgeye became extremely hostile.  McCullough became more obsessed with Terman, reflecting his obsession with CNBC.

92.     In malicious retaliation against Terman, Hedgeye senior officers McCullough and Blum made defamatory statements about Terman on the Hedgeye TV platform, falsely accusing her of plagiarizing him and using McCullough's ideas, based on her use of generic industry terms such as "implied volatility" and "upside/downside."

93.     McCullough published these false accusations in other forms.

94.      On February 10th, 2022, McCullough tweeted "Her copying my language and process wasn't subtle."  This accusation, made in McCullough's capacity as Hedgeye's CEO, was false. As McCullough knew based on own appearances on the program, CNBC's Fast Money is a one-hour show that airs an hour after the market close each day and focuses on the most active stocks and news flow of that trading day. It is an unscripted show, and potential topics are not confirmed until minutes before the contributors would need to connect with CNBC to prepare for the show's start, with actual discussions being impromptu, and with the producer regularly changing show topics during commercial breaks. Accordingly, Terman and her colleague would connect several times each day and propose data and points to be made, if the opportunity arose, but without knowing how the show would progress. Thus, it would not be possible for Terman to copy Hedgeye processes and ideas on Fast Money.

95.     McCullough knew that his accusations of plagiarism against Terman were false. As a former guest on media platforms such as Fox Business, CNBC and Bloomberg, and as a frequent viewer of Fast Money, he was fully aware of shows' focus on the most recent market events and knew that Terman could not be contributing to the show simply by "copying" his process.  He also

knew that neither he nor Hedgeye enjoyed any proprietary right or special claim to generic industry terms like "implied volatility," "growth," "inflation", "upside," "downside," or "risk ranges."

96.    McCullough and Hedgeye personnel made other defamatory statements containing similar false allegations.

97.    For example, McCullough tweeted about Terman that: "There is a CNBC contributor in particular…if you can bear listening to her terrible stock picks, she tries speaking my Quad language" along with a retweet of CaffeineAddict Java/Joe "OK…@KeithMcCullough not sure if you're listening to CNBC but one of analysts just used your 'Goldilocks' explanation almost verbatim…someone is a subscriber over there". As McCullough knew when he tweeted this false accusation, he did not invent the use of the "Goldilocks" metaphor for financial markets; the economist David Shulman is commonly given credit for coining the phrase "Goldilocks economy" in an often-cited 1992 article.

98.    Although Hedgeye's CEO falsely accused Terman of plagiarism in allegedly appropriating "my Quad language", Hedgeye knew that claim was false.  Hedgeye's own marketing material acknowledges the widespread use of the simplistic Quad framework, which was developed and popularized not by Hedgeye but by "billionaire investor and Bridgewater founder Ray Dalio." As McCullough later admitted on March 30, 2021, The Macro Show: "Getting the Quads is easy.  It's a 2 by 2 model. It's a rate of change of growth and inflation…"

99.    Hedgeye's CEO also falsely accused Terman of taking credit for general financial terms. On March 4, 2022 McCullough tweeted "Thank you  People using my #process language is a compliment, unless they're claiming that they made up the language on their own  See @NadineTerman on what not to do-lacks #integrity to the core". When McCullough tweeted this false accusation, he knew that Terman never claimed she originated general financial terms.

100.    Nonetheless, Hedgeye persisted in falsely accusing Terman of imitating Hedgeye's "process." On February 10, 2022 Blum tweeted: "Terman has also continued to promote herself and Solstein Capital on @CNBC using the Hedgeye process implemented through 42 Macro, while aware that Hedgeye does not approve of her doing so without crediting Hedgeye" Blum made this statement even though he knew that Hedgeye approach is not unique, but broadly known and used across the industry with investors creating their own versions of similar work. As McCullough stated on another occasion: "When you put it together with how you play the game…It's not something that someone can actually steal or copy from you. It's something that you can make your own."

101.    Perhaps the most absurd claim that Hedgeye made against Counterclaimants was the false accusation that Terman had copied an investment idea called Dufry, as discussed by Hedgeye researcher Brian McGough in February and March of 2021. Hedgeye falsely claimed that Terman had copied the investment idea in a March 2021 Fast Money appearance on CNBC. For example, in a March 30, 2021 email to Blum and Daryl Jones, McCullough wrote: "And did Solstein really put us on 'hold'? I'll fire her – she literally copied my process (and ideas like DUFRY)."  McCullough repeated this lie on Hedgeye's program The Call and other Hedgeye programming.

102.    Other Hedgeye subscribers picked up on this false accusation and echoed it on Twitter and in other media. For example, Solstein received multiple harassing emails from a Hedgeye subscriber parroting the false claim that she had copied Hedgeye's Dufry investment idea in her CNBC appearance.

103.    The Dufry claims were false. Solstein was a long-time investor in Dufry and other airport-related stocks and had purchased Dufry shares for client portfolios long before Hedgeye

mentioned the stock. She discussed the stock on Fast Money only because CNBC selected it from a list of Solstein's portfolio holdings and reached out to Terman, asking her to discuss it on the program.

104.    Hedgeye knew that the Dufry claims were false. They knew that Terman had not viewed McGough's video presentation on Dufry. Because they obsessively reviewed video footage of Terman's CNBC appearances, they also knew that there were few material similarities between her presentation and McGough's other than commonplace observations about the Dufry business and widely known information that any analyst would mention. Finally, they also knew that subjects for discussion on Fast Money like Dufry would normally be suggested by CNBC, not by Terman. But despite knowing the Dufry claims were false, they proceeded to publish them with malicious intentions against Terman and Solstein, deliberately amplifying and spreading them among their social media following.

105.    Despite knowing them to be false, McCullough and Hedgeye nonetheless published each and every one of their false and defamatory statements against Terman and Solstein out of malice, to harm Terman's business reputation and to harm Solstein's business. They did so in retaliation against Terman and Solstein for their relationship with Hedgeye's perceived business rival, CNBC.

**Hedgeye Terminates the Relationship with Solstein and Terman**

106.    In March 2021, Hedgeye sent an invoice to Counterclaimants for Hedgeye services to be provided in the second quarter of 2021.

107.    Counterclaimants, however, had some concerns about Hedgeye's services. Terman had learned that Hedgeye was providing subscription options that provided services similar to those provided to Solstein but at a significantly discounted price. Also, Solstein was not given

access to new services to which other subscribers had access such as "The Arena," even though those subscribers were paying considerably less than Solstein.

108.    On March 22, 2021, Terman called Darius Dale – the person who led Hedgeye's macroeconomic research and Solstein's lead contact at Hedgeye – to address these concerns about the Hedgeye subscription. To her surprise, Dale informed her that a couple weeks earlier he had given Hedgeye notice of his resignation from the firm.

109.    Terman was troubled to learn Hedgeye had concealed the critical fact of Dale's resignation announcement from Counterclaimants when they sent out the invoice for second quarter services. Hedgeye knew that Counterclaimants subscribed to Hedgeye's macro product, but inexplicably failed to disclose Dale's resignation when requesting payment of the second quarter invoice.

110.    From March 23, 2021 through April 1, 2021, Terman corresponded with Hedgeye about Solstein's subscription renewal for Hedgeye services, asking for additional information. Counterclaimants wanted to understand Hedgeye's plan for their macroeconomic offering, which was an important part of Solstein's subscription.

111.    But by March 31, 2021, McCullough had already decided to cut Solstein off from Hedgeye's services in retaliation for her CNBC appearances.

112.    The following day, April 1, 2021, unaware of Hedgeye's decision to retaliate against her and Solstein, Terman informed Hedgeye that she had decided to go ahead with the Macro Pro subscription for the next quarter and requested additional subscriptions to four industry sectors under the Hedgeye Sector Pro service.

113.    About an hour later, Hedgeye responded, refusing to honor the subscription request and terminating all existing services to Terman and Solstein.

24

114.    Hedgeye's refusal was yet another violation of its ADV, which discloses that small registered investment advisors like Counterclaimants are eligible to obtain mass market subscriptions.

### D.  Hedgeye's Abuse of Legal Process and Targeted Efforts to Poach Solstein Clients

115.    On April 26, 2021, Hedgeye filed a federal lawsuit against Darius Dale, principally alleging trade secret misappropriation. The lawsuit was accompanied by a bitter and highly personal social media attack campaign against Dale that continues to this day, using epithets and accusations of criminality in a scorched earth effort to destroy his reputation in the industry.

116.    Hedgeye's conduct extended to posting confidential documents obtained from Dale in discovery on social media platforms.  Hedgeye's President, Michael Blum, justified this conduct by the explanation that he was "chomping at the bit" to reveal the discovery materials to the public and that he had "ran of patience with the lawyers" waiting to receive permission to do so.

117.    Although Hedgeye began its lawsuit against Dale by alleging an emergency requiring expedited treatment, once the lawsuit began to focus on its lack of bona fide trade secrets, Hedgeye reversed its tactics, employing a series of delay tactics to put off the deadline for filing an expert report substantiating its trade alleged secret allegations.

118.    As part of its strategy of divert and delay, Hedgeye also filed a baseless lawsuit against Counterclaimants.

119.    Hedgeye filed the lawsuit against Counterclaimants knowing that the principal allegations were false and that it had no valid legal claims against them.

120.    For example, the original complaint filed against Counterclaimants contained numerous allegations that Hedgeye knew were false based on their receipt and review of discovery materials in the Dale litigation, as well as their internal communications, including but not limited to: (a) falsely accusing them of ownership interests in 42 Macro when Hedgeye knew they held no

25

such interest; (b) falsely accusing them of "inducing" Dale to leave Hedgeye when Hedgeye knew that Dale had previously informed them of his intention to leave over a week before Dale spoke with Terman; (c) falsely accusing them of accessing Hedgeye "source files" based on evidence of a file name that Hedgeye knew to be associated with an output file, not a source file; (d) falsely accusing Solstein of firing Hedgeye as a service provider.

121. After warnings from Counterclaimants, although Hedgeye's third amended complaint eventually withdrew some of these factual misrepresentations, the damage had been done, and Hedgeye still retained others, including the false allegations of inducing Dale's departure and the false allegations of accessing Hedgeye source files.

122. Hedgeye did not file the lawsuit against Counterclaimants for the purpose of obtaining redress and relief authorized by law. Hedgeye knew that not only did its lawsuit lack a valid factual and legal basis, but that it had suffered no articulable losses or damages as the result of the conduct falsely alleged in its suit.

123. Hedgeye's true motivation for suing Terman and Solstein was to achieve collateral, illegitimate and extra-legal benefits.

124. First, Hedgeye knew that suing Terman and Solstein would cause CNBC to suspend Terman's appearances, thereby retaliating against her and punishing her for establishing a relationship with the network they so hated. To ensure this result, Hedgeye created a press release with defamatory falsehoods and highlighted the CNBC name, and Hedgeye deliberately attached an @CNBC/Fast Money to the defamatory statements it made on Twitter about Terman and Solstein.

125. On February 10th, 2022, Hedgeye tweeted and Blum re-tweeted directly to @CNBC FastMoney a link to their press release with the defamatory and incorrect claims.

26

126.    Second, fully aware of the legal weaknesses of its trade secret suit against Dale, Hedgeye sought to use the lawsuit against Terman and Solstein to gain settlement leverage against the Dale defendants, threatening them with an expansion of the scope of the lawsuit and further delays in reaching a decision.

127.    Third, because of Hedgeye's animus towards Terman, Hedgeye sought to use the lawsuit against the smaller firm to exhaust its resources and spread false information to existing and potential clients.

128.    Finally, as described further below, Hedgeye intended to use (and did use) its lawsuit against Counterclaimants, to sow dissension and confusion among those Solstein clients who also subscribed to Hedgeye and to induce those clients to abandon Solstein.

### E. Hedgeye's Vicious Campaign of Character Assassination Against Terman and Solstein

129.    Consistent with the extra-legal intent of its lawsuit, Hedgeye engaged in a social media campaign of character assassination against Terman and Solstein. Hedgeye openly boasted that one purpose of its social media attacks was to harm the Counterclaimants' business and cause client defections.

130.    Hedgeye's attacks on Terman and Solstein, which dated back to her first appearance on CNBC the prior year, accelerated after its lawsuit was filed.

131.    Roughly simultaneously with the filing of the lawsuit, Hedgeye released a press release on prnewswire including defamatory statements Hedgeye made despite knowing they were false, accusing Terman of "developing a plan" to "steal Hedgeye's trade secrets," and falsely claiming claimed that Terman and Solstein had "directly accessed" Hedgeye trade secrets.

132.   This included the false statements in the February 9, 2022 prnewswire press release, stating that:

- "Terman demonstrated a pattern of exploiting her relationship with Hedgeye to misappropriate the firm's intellectual property. After becoming a CNBC contributor in 2020, she was known to use Hedgeye's unique jargon and nomenclature, parrot Hedgeye's market predictions, and reference Hedgeye's research without credit given to Hedgeye."

- "Seeing an opportunity to end Solstein's reliance on Hedgeye in March of 2021, Terman contacted then-Hedgeye Macro Analyst, Darius Dale. Together, they developed a plan to exploit Hedgeye's intellectual property whereby: 1) Dale would steal Hedgeye's trade secrets 2) Dale's and Terman's partner and co-conspirator Steven Lamar would finance and manage the launch of Dale's competing business, "42 Macro" and 3) The competing business would "sell" virtually identical research to Solstein Capital that Solstein had been buying from Hedgeye."

- "Terman, Dale and Lamar launched their competing company, "42 Macro," whose entire business consists of selling research derived from stolen Hedgeye financial models, just days after Dale's resignation. At the same time, Terman ended Solstein's subscription to Hedgeye's research.

133.   In addition, also in the February 9, 2022 press release, Blum went on the record directly to falsely accuse Terman and Solstein of "stealing" and "destroying evidence to conceal wrongdoing," characterizing their conduct as "depraved, egregious, and immoral": "It's shocking how depraved, egregious & immoral the action of these particular individuals were. Stealing is not

acceptable when conducting business in our country. Destroying evidence to conceal wrongdoing should not be tolerated in the US legal system." Blum knew full well that Terman and Solstein had neither stolen anything, nor destroyed evidence.

134. Blum, acting in his capacity as a Hedgeye officer, also falsely stated in a February 10, 2022 post on the Twitter social media platform that "[i]n March 2021, Terman contacted and spoke to Darius Dale and conspired in a plan by which Dale would steal Hedgeye's trade secrets. Lamar would finance and manage their launch of a competing business, and the competing business would sell to Solstein Capital virtually identical research that Solstein had been buying from Hedgeye, but at a fraction of the cost. Terman and Solstein would have both Ryan, responsible for running the signaling component of the Hedgeye macro process . . ." Every one of these claims was false and Blum and Hedgeye knew it when this tweet was posted. Not only did Hedgeye know that Terman and Dale did not discuss a plan to steal Hedgeye trade secrets, Hedgeye averred the exact opposite in this very action, correctly alleging that Terman counseled Dale against taking any Hedgeye intellectual property. Hedgeye also knew that 42 Macro was not selling anything to Solstein and that Counterclaimants no longer used Hedgeye services only because Hedgeye had terminated them. Hedgeye also knew that Ben Ryan, who Blum referred to in his tweet, had never been "responsible for running the signaling component of the Hedgeye macro process."

135. On February 11, 2022, in a ham-fisted effort to induce Terman's partners at Solstein to act against her, Blum again falsely accused Terman of "IP theft," in a tweet, stating that: "It is possible that Terman's partners had no idea of her actions in her capacity as their CIO. Solstein has an opportunity right here to prove this to us. Or maybe they were fully briefed on the IP theft and participated?"

136. Hedgeye knew that these statements were false, and the Twitter posts and press release were based on falsehoods, when they made them. Having reviewed the evidence obtained in discovery – and in some cases having improperly disclosed them on social media – Hedgeye knew that there was no evidence that Terman and Solstein had stolen anything or destroyed evidence. Nonetheless, it deliberately made these false statements of fact with malice and the intent to harm Terman and Solstein's reputations and to cause business harm.

137. Unfortunately, Blum was just getting started. Over the following weeks, he issued a torrent of false and defamatory statements on Twitter against Terman and Solstein, with the malicious intent of destroying their reputations. These included:

- On February 11, 2022, Blum tweeted: "Here the smoking gun. We have the documents in BLACK & WHITE – though they don't want you to see them. Terman advised & actively worked with Dale to destroy evidence of his misconduct prior to Dale's resignation, even offering Solstein's services to help conceal his theft".

- On February 24, 2022, Blum published a tweet on the Twitter social media platform, falsely claiming that "On April 26, 2021, Terman and Solstein Capital, through 42 Macro, began publishing content based on models derived from Hedgeye's trade secret source models." Blum knew that Terman and Solstein had no financial interest or control over 42 Macro and that they had never published models containing Hedgeye content.

- The same day, Blum also published another tweet falsely claiming that: "Terman conspired with Dale as to how they might get around that 'technicality' of Hedgeye owning intellectual property."

30

- The same day, Blum also tweeted "…she & her firm engaged in conduct unimaginable for a trusted-client-conspiring to steal Hedgeye's trade secrets,"

- On February 24, 2022, Blum tweeted and then McCullough retweeted a misleading statement meant to confuse readers and clients "After his extensive copying of @Hedgeye confidential info & trade secrets to his personal Dropbox, Dale & Terman both shared access to a folder in Dropbox named "42 Macro." Terman & Solstein thereby themselves directly acquired Hedgeye's confidential information & trade secrets." Both McCullough and Blum knew that (i) the Dropbox folder was not the same as that on Darius' computer, (ii) confidential files and trade secrets were not saved to the shared Dropbox, and (iii) Solstein has not had access to the files.

- On February 25, 2022, Blum tweeted the false claim that "Terman and Solstein thereby themselves directly acquired Hedgeye's confidential information and trade secrets."

- On March 1, 2022, Blum retweeted a tweet from "CaffeineAddict Java/Joe," stating that "When a judge takes your request for a gag order & tells you to pound sand that's a pretty good indication you're full of shit Nefarious & @NadineTerman. He's telling you everyone should know you conspired to hijack @KeithMcCullough model." Blum retweeted the statement without further clarification, even though he knew Terman had made no request for a gag order and that this Court had made no finding of conspiracy or wrongdoing by Terman.

- On March 1, Blum tweeted two links to its press releases and then wrote: "I've posted a lot of the verbatim rulings & complaints w/ evidence. The most important:

i) Judge Carter already ruled @Hedgeye is likely to prevail on the merits & ii) Dale repeatedly lied and had to be cautioned by the court." The tweet was followed by a pictorial link to the press release. Blum knew when he made this statement that Judge Carter had not made any ruling concerning Terman and Solstein.

- On March 11, 2022, Blum tweeted that "the evidence of Dale's misappropriation is literally undisputed" and that "[s]imilarly, Dale has produced evidence irrefutably establishing the active participation of Defendants Nadine Terman and her company Solstein Capital." Blum knew when these statements were made that Dale was hotly disputing Hedgeye's misappropriation claims and that the evidence produced by Dale irrefutably established that Terman and Solstein were not involved in any misappropriation of the alleged Hedgeye property.

138.    Hedgeye principal McCullough actively joined in the vicious campaign of abuse:

- McCullough retweeted about Terman and Solstein on February 9, "Thieves are never sorry they stole. They are sorry they got caught. What I read today proves that."

- On February 12, 2022, McCullough tweeted "Terman left Blum Capital (where she was a bottom up stock picker, not a Macro investor)…  And basically had no research team at Solstein (initially) -then she started using mine…"  Solstein has maintained a similar size investment team over its history, contrary to this statement.

- On February 14, 2022, McCullough retweeted "of course anything over 31 is in the "uninvestible bucket" clearly she couldn't say F*ck bucket on @CNBC so she stole the next best HE description (emoji)"

- On February 25, 2022, McCullough retweeted Blum's false claims that Terman and Solstein had "directly acquired" Hedgeye trade secrets from Dale, adding "Shame on you Nadine Terman."

- On February 25, 2022, McCullough retweeted a tweet by Blum stating "In other words, Hedgeye's customers were not just targets of Terman, Dale and Lamar, they were the prime targets.  Terman knew and intended that by supporting 42 Macro, she would damage Hedgeye."

- On March 1, 2022, McCullough retweeted "Nefarious has teammates…a co-conspirator, I mean Co-CEO @Nadine Terman & an analyst team.  Plagiarism & Copy/Paste, they've been central to his platform & research.   Integrity unfortunately, failed the recruiting process, reminded him of @KeithMcCullough's "racist team"."

- McCullough falsely tweeted March 3, 2022, that: "We know how valuable my process is. Its why @Nadine Terman was keen to conspire to steal it" in response to Rahul Deodhar's reply to McCullough "That Vol of Vol bit is quite crucial-that is ONE secret sauce (and lots of data streams, tracking wide array of market variables, etc.) each either confirming or not what the markets are telling us. Mandelbrot talked about this a lot."  As Hedgeye's marketing has repeatedly confirmed, Benoit Mandelbrot in the 1970's began to make the world aware of fractals, or repeating patterns that occur in nature as well as in various financial returns. In his 2004 book, which McCullough has often mentioned, *The (Mis)behavior of Markets*, Mandelbrot explained the relevance of fractals to trading securities and discussed the idea of volatility clustering. When McCullough posted

his March 3, 2022 tweet falsely accursing of Terman of "conspiring to steal" his "process," he knew that the process he referred to was not "his" but rather his repetition of Mandelbrot's published and publicly available ideas.

- On May 2, 2022, McCullough falsely tweeted that: "Nadine @Nadine Terman tried stealing my '3 Buckets of Volatility too," again falsely trying to claim proprietary rights over a common investment concept that predated him and simultaneously falsely accusing Terman of taking the concept when she had not done so.

139. Each and every one of these statements were made by Hedgeye with the knowledge they were false and with the malicious intent to cause injury to the reputations and business of Terman and Solstein.

140. McCullough and Blum both highlighted Hedgeye's intent and purpose to force Terman off CNBC.

- On February 9, 2022, McCullough Retweeted "The scumbags they let on @CNBC seem to be getting worse and worse…"

- On February 10th, 2022, Hedgeye tweeted and Blum retweeted, "Dear @CNBCFastMoney, We know it's been years since @KeithMcCullough appeared on your show/network.  In case you were wondering why so much of what you've been hearing recently sounds like Keith, here's your answer!  …you can read all about it (link to Hedgeye press release, picture of Terman).

- On February 10, 2022 McCullough retweeted "Damning evidence. Screwed by an employee and two clients. "Oh what a tangle web we weave when first we practice to deceive" their actions reveal incredible misjudgment and hence terrible advisors. I would hope CNBC will ban Nadine Case closed"

34

- On March 3, 2002, Blum boasted that Hedgeye's lawsuit had succeeded in removing Terman and Solstein from CNBC. Blum tweeted "…It appears, that following our suit against Nadine Terman & Solstein Capital, @CNBC has not had her on the air."

- On May 2, 2022, McCullough tweeted "Indeed. I do not believe she's appeared on CNBC since @mablum proceeded with the evidence"

141.    Each and every one of these statements were made by Hedgeye with the knowledge they were false and with the malicious intent to cause injury to the reputations and business of Terman and Solstein.

142.    Hedgeye also threatened Terman and Solstein's existing and potential business partners and clients and pressured them to cease doing business with Counterclaimants, threatening them with retaliation if they did not accede to Hedgeye's demands.

- For example, in response to a Hedgeye subscriber who asked to be kept out of the personal attacks against Terman, Blum threatened retaliation, stating that "[p]eople should be aware of the choices you are making."

- Blum tweeted "I do wonder what Solstein clients' have to say about all of this… (picture of confidential discovery)".

- On February 10, 2022, Blum retweeted "Hey @AndreasSteno, just wanted to give you a heads up on who the "analyst" you were on @RealVision w…@KeithMcCullough & @mablum have watched @RaoulGMI bury his head in response to this, he had NO one else that could match KM's knowledge so he settled for the one that stole it." "What say you @RaoulGMI @ttmygh @AshBennington @RealVision. You talk abt being the honest alternative to MSM. Opine abt their

dishonesty lack of accountability, yet consistently bring back Darius Dale who conspired w @NadinTerman, @steve7lamar to hijack @KeithMcCullough models."

- Blum also admitted via Twitter that on February 11, 2022, he had knowingly spread his falsehoods to Solstein clients, boasting that "I've already heard from a Solstein LP who is considering to pull money from the firm."

- On February 11, 2022, Blum tweeted "If you were involved, if you assisted, aided, and/or abetted we are coming after you & you will be publicly exposed."

143.    On February 9, 2022, Blum gratuitously sent Hedgeye's false and misleading press release about their lawsuit against Terman and Solstein to Raoul Pal, principal of Real Vision and an individual who enjoys a significant online following.

144.    Pal responded to Blum's message by stating that "you do not have the right to demand that we either don't work with a person or remove their content."

145.    Pal's response infuriated Blum, who answered back with extortive threats against Pal if he did business with Terman and Solstein, accompanied by a series of bald-faced, malicious lies: "However, we are not in a divorce. That matter has essentially been settled by the court. We are now in corporate espionage territory. If you cannot accept that the judge has already resolved the IP theft / misappropriation matter, then we are headed in the wrong direction. … Our complaint against Terman and Solstein Capital is backed by hard evidence uncovered during discovery. We have a conspiracy of highly unethical people who represent the worst of our industry. . . . Its not going to be possible for us to partner with businesses that fail to recognize this."

146.    Blum knew every single one of these statements to Pal were false when he made them. The statement to Pal that Terman and Solstein had engaged in "corporate espionage" was

false and Blum knew it was false. To the contrary, Blum knew that Solstein had no involvement in discussions with Dale about his departure from Hedgeye. Blum also knew that, far from engaging in "corporate espionage" against Hedgeye, Terman never sought, accepted, nor received any claimed Hedgeye trade secrets; had advised Dale to take due care with respect to Hedgeye's claimed property; and further advised Dale to obtain legal counsel to explain to him the scope and extent of Hedgeye's property rights.

147.    Blum's statement "the judge has already resolved the IP theft / misappropriation matter" was also false. At the time, the case against Terman and Solstein was only a few days old and no substantive proceedings had occurred, much less any judicial resolution. Blum and Hedgeye also knew that in the separate Dale litigation, Hedgeye's trade secret misappropriation claims were very far from being resolved and that whether Hedgeye had any protectible trade secrets at all was a hotly contested issue on which no judgment had been issued.  He also knew that although the Court had granted some limited injunctive relief in the Dale litigation, the Court had also rejected Hedgeye's requested injunctions to bar 42 Macro from doing business.

148.    Blum's statement that: "Our complaint against Terman and Solstein Capital is backed by hard evidence uncovered during discovery" was also false. In fact, Blum knew that the 'hard evidence" uncovered during discovery contradicted the key allegations of its complaint against Terman and Solstein.

149.    Finally, on March 9, 2023, Michael Blum sent out a tweet on behalf of Hedgeye, which he advertised @Hedgeye to be the "NO FRAUD ZONE."  The tweet went on to specifically name Nadine Terman as being one of several identified "scoundrels, frauds, thieves, liars & cheats." Blum also named the Twitter handle of Mr. Pal, thus following up on his extortionate threat to attack Pal if he did not cease all relationships with Ms. Terman and Solstein.

150. Blum and Hedgeye knew that the March 9, 2023 tweet was false when it was made. They knew that neither Solstein nor Terman has ever been even accused of fraud, much less engaged in one. They also knew that Solstein and Terman are not and never have been "thieves, liars & cheats." In particular, Hedgeye knew that neither Solstein nor Terman had ever acquired or even seen the Hedgeye source files, client lists or other materials that Hedgeye falsely claims as its trade secrets.

151. Unfortunately, Hedgeye's campaign of character assassination had its intended effect of seriously harming the Counterclaimants' business. To begin with, CNBC ceased providing any further appearance dates for Terman, either on Fast Money or any other CNBC program, in response to Hedgeye's attacks on Terman and Solstein.

152. Hedgeye also exploited its false and malicious allegations to poach Solstein clients for the benefit of its Sierpinski investment affiliate, inducing the clients to break their relationships with Solstein and recommending that they put their money into the investment vehicle for Sierpinski.

153. In particular, two Solstein clients contacted Hedgeye after reviewing the prnewswire press release. Instead of declining to comment or correcting their false allegations, Hedgeye doubled down on their false allegations against Counterclaimants and encouraged the clients to break their agreements with Solstein. In response, the two clients renounced their agreements with Solstein and pulled all their funds. Hedgeye then encouraged the clients to place their money with North Coast Asset Management, the investment vehicle providing a Sierpinski-supplied investment portfolio solution.

154. Hedgeye's false allegations against Counterclaimants also caused another institutional client to withdraw from an agreed $100 million contract with Solstein. In addition,

Solstein lost at least one another opportunity for an institutional client agreement of similar magnitude.

155.   In each and every instance, the false and defamatory statements made by Hedgeye against Terman and Solstein were made with the knowledge they were false and the malicious intent to cause injury to the reputations and business of Terman and Solstein. Hedgeye acted with malice to retaliate against Solstein and Terman, both for Terman's decision to appear as a contributor on CNBC's Fast Money and because she gave friendly advice to Dale after Dale decided to leave Hedgeye.

**FIRST CAUSE OF ACTION**
**(Fraud in the Inducement – Hedgeye Agreement)**

156.   Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

157.   In connection with the Agreement, Hedgeye made false statements and material omissions of fact to Terman and Solstein, including:

(a) falsely representing that Hedgeye complied with industry regulations when it did not;

(b) falsely representing that Hedgeye was entitled to invoke the "newsletter" exemption to federal registration, when it was not.

(c) falsely representing Hedgeye's affiliation with Sierpinski from 2019-2021 and omitting to disclose required conflicts of interest with respect to Sierpinski;

(d) on and after March 31, 2021, continuing to omit material disclosures about conflicts of interest with Sierpinski.

(e) falsely representing and omitting required disclosures of Hedgeye's material conflicts of interest which included, upon information and belief, facilitated trading ahead to the

disadvantage against Hedgeye subscribers, thus materially degrading the value of its services;

(f)   falsely marketing Hedgeye's performance; and

(g) falsely representing Hedgeye's services, including position sizing and advice.

158.    Hedgeye knew that the above misrepresentations and omissions were false and misleading when they were made but made them to induce Terman and Solstein to subscribe to Hedgeye's services and to continue subscribing to such services.

159.    Terman and Solstein relied on Hedgeye's misrepresentations and omissions in subscribing to Hedgeye's services. Had Hedgeye told the truth, Terman and Solstein would not have subscribed in the first place, and Solstein would have cancelled its subscription once the truth was known.

160.    As a result of Hedgeye's fraudulent inducement, Terman and Solstein were damaged in the amount of subscriber fees paid to Hedgeye, equaling approximately $420,000. Also, Solstein's clients were damaged due to the conflicts of interest, to an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Tortious Interference with Contract)**

161.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

162.    Hedgeye was aware of Terman's contract to appear as a paid contributor to CNBC. Hedgeye was also aware of at least two clients of Solstein who had placed funds with the firm.

163.    As discussed above, Hedgeye deliberately procured the suspension of Terman's appearances by CNBC.

164. Hedgeye also deliberately procured Solstein clients to pull funds and a contract from Solstein.

165. In each case, Hedgeye procured the termination without justification, using tortious conduct, and for the sole and malicious purpose of inflicting intentional harm on Terman and Solstein. In each case, the third party ended their contractual relationships with Terman and Solstein, respectively, because of Hedgeye's interference.

166. But for Hedgeye's conduct, Solstein would not have lost the client relationships and would still be actively appearing on CNBC.

167. As a result, Solstein and Terman have been damaged in an amount to be determined at trial, but in no event less than $3.4 million.

### THIRD CAUSE OF ACTION

### (Tortious Interference with Prospective Economic Relationships)

168. Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein

169. Hedgeye was aware of Terman's business relationships with CNBC and with at least two of Solstein's business clients.

170. Hedgeye deliberately procured the suspension of Terman's appearances on CNBC.

171. Hedgeye also deliberately procured Solstein clients to pull funds and a contract from Solstein.

172. Hedgeye also deliberately procured the loss or suspension of institutional client relationships and agreements with two other parties, each equal to or in excess of $100 million.

173. In each case, Hedgeye procured the terminations without justification, using tortious conduct, and for the sole and malicious purpose of inflicting intentional harm on Terman

and Solstein. In each case, the third party ended or suspended their business relationships with Terman and Solstein, respectively, as a result of Hedgeye's interference.

174.   But for Hedgeye's conduct, Solstein would not have lost the client relationships and would still be actively appearing on CNBC.

175.   As a result, Solstein and Terman have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Defamation)

176.   Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

177.   Hedgeye made false statements of purported fact about Terman and Solstein, as specifically listed in Paragraphs 92, 94, 97-101, 125, 131-145, and 149 of these counterclaims, among others.

178.   Hedgeye published those statements through official press releases, tweets on the Twitter platform aimed at thousands of followers, and through on-line corporate communications.

179.   Hedgeye made these statements deliberately and maliciously, with knowledge of their falsity, and with the intent to harm Terman and Solstein out of malice.

180.   As a result, Solstein and Terman have had their reputations harmed and suffered the following specific injuries as a direct consequence of Hedgeye's defamation: the loss of the CNBC appearance and the loss of at least three contracts with a combined investment exceeding $100 million.

181.   Terman and Solstein's monetary damages from Hedgeye's defamatory statements shall be in an amount to be determined at trial, but in no event, less than $5 million.

## FIFTH CAUSE OF ACTION
### (Malicious Prosecution)

182.    Counterclaimants repeat and re-allege the allegations contained in all the paragraphs above as though set forth in full herein.

183.    On February 9, 2022, Hedgeye initiated an action against Counterclaimants Terman and Solstein (the "Action").

184.    The Action was brought with malice by Hedgeye, with the knowledge that the Action lacked legal and factual basis, that Hedgeye had no losses or other damages redressable at law, and that the Action had no meaningful chance of success.

185.    Hedgeye brought the Action for malicious, extra-legal purposes, to achieve illegitimate purposes.

186.    Hedgeye intended to use (and did use) the Action for the improper purpose of inducing Solstein clients to leave Solstein and to solicit them as investors into an affiliated investment vehicle.

187.    Hedgeye dismissed the Action on July 28, 2022.

188.    The Action caused specific and special damages to Terman, including: the loss of Terman's speaking engagement at CNBC and the loss of three Solstein contracts and investments worth over $100 million. On a consequence, Terman and Solstein were monetarily damaged in amount to be determined at trial, but in no event, less than $5 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

a) Enter judgment against Plaintiff-Counter-defendant and in favor of Counterclaimants.

b)  Award Counterclaimants their compensatory damages in an amount to be proven at trial.

c)  Award Counterclaimants appropriate punitive damages;

d)  Award Counterclaimants interest, reasonable costs, attorney's fees, and disbursements;

e)  Grant such other relief as it deems necessary and proper.

## JURY DEMAND

PLEASE TAKE NOTICE that Counterclaimants demand a trial by jury on all issues so triable.

Dated:  New York, New York
       March 14, 2023

**PRESS KORAL LLP**

By:   /s/ Jason Koral
          Jason M. Koral

641 Lexington Avenue, 13th Floor
New York, NY 10022
tel: (212) 922-1111
fax: (347) 342-3882
cell: (347) 419-0983

*Attorneys for Defendants Nadine Terman and Solstein Capital, LLC*